S97P1474. JENKINS v. THE STATE.
(498 SE2d 502)

HUNSTEIN, Justice.

Larry L. Jenkins, Jr. was convicted of the malice murders and kidnappings with bodily injury and armed robbery of Terry and Michael Ralston, and theft of $600 in coins. The jury recommended

two death sentences for the murders, finding the following nine aggravating circumstances: the murder of Michael Ralston was committed during the commission of a kidnapping and in the commission of the murder, kidnapping, and armed robbery of Terry Ralston; the murder of Terry Ralston was committed during the commission of a kidnapping and in the commission of the murder and kidnapping of Michael Ralston; and that each murder was committed for the purpose of receiving money. OCGA § 17-10-30 (b) (2), (4). The trial court sentenced Jenkins to death and Jenkins appeals.[1] We affirm.

1. The evidence adduced at trial showed that at 8:30 p.m. on January 8, 1993, Terry Ralston and her 15-year-old son Michael left their home in Ms. Ralston's white Chevy Lumina van to drive to their family-owned laundromat in Jesup in order to collect coins from the machines and otherwise close the store. Two hours later, when they failed to return home, a family member went to the laundromat and discovered the establishment locked but only partially cleaned. The next day the bodies of Terry and Michael Ralston were found lying face down in a ditch near the railroad tracks. Michael had been shot six times from behind at close range, including once in the back of the head. His mother was shot once at the base of the skull. A piece of fresh onion was found next to the bodies. A witness residing in the vicinity where the bodies were discovered testified that she heard shots fired between 9:00 and 10:00 p.m. on January 8.

Witnesses testified that they observed Jenkins driving Ms. Ralston's white van after 10:30 p.m. on the night of January 8 as he drove around Jesup picking up some friends to go to a club. He picked up David Wilkerson at 11:30 p.m. after Wilkerson's job shift ended and picked up Burnies Durden shortly thereafter from an apartment where Durden had been playing cards since 5:00 p.m. Jenkins informed his friends that the van belonged to his mother. Jenkins carried a .22 Grendel magnum pistol and the van contained a duffle bag holding over $600 in quarters. Jenkins drove his friends to a

---

[1] The crimes occurred on January 8, 1993. Jenkins was indicted by the Wayne County grand jury for malice murder (two counts), felony murder (two counts), kidnapping with bodily injury (two counts), armed robbery, burglary, theft by receiving and theft by taking (two counts) on January 25, 1993. On June 9, 1993 the State filed a notice of intent to seek the death penalty. On September 29, 1995, the jury found Jenkins guilty of the malice murders, kidnappings, armed robbery, and theft counts; the trial court directed a verdict of acquittal on the burglary charge. The trial court merged one count of theft by taking into the armed robbery and merged the theft by receiving into the remaining count of theft by taking. The following day, the jury returned its recommendation of a death sentence for each murder count, and the trial court imposed that sentence, plus three life sentences for the kidnappings and armed robbery and ten years for the theft by taking, all sentences to be served consecutively. Jenkins' motion for new trial, filed October 30, 1995 and amended on July 6, 1996 and October 9, 1996, was denied on January 16, 1997. Jenkins filed a notice of appeal to this Court on February 11, 1997. The case was orally argued on October 20, 1997.

nearby town in the van where they went to a club and spent the night at a woman's house. The next day, Jenkins discussed the incident with Durden telling him that he had robbed a laundromat and shot and killed a lady and her son with a .22 along some railroad tracks after the boy "started to buck" and the woman began screaming. Jenkins drove the van back to Jesup where he, Durden and Wilkerson placed the quarters in coin wrappers. Jeramon Campbell joined the others and, after being told by Durden about Jenkins' admission to robbing and killing two people, asked Jenkins if it was true. Jenkins replied that he was "just kidding," but he later showed Campbell and Durden Michael Ralston's learner's permit.

Thereafter, the four men drove around Jesup and tried to cash in the quarters. At one store that Campbell entered, the cashier refused the coins because some people had been robbed the night before and were missing. When questioned by Campbell about this comment, Jenkins did not answer and told Wilkerson, who was driving, to back out so the cashier could not see the van's license plate number. The police subsequently spotted the van and pulled it over; the passengers escaped on foot, but Wilkerson turned himself in to police at a nearby police station. Rolls of quarters, a clip from a .22 automatic weapon, a sportsbag, a box of .22 cartridges and two onion peels were found in the van. Jenkins threw the murder weapon into some bushes when he ran from the van and dropped a backpack which contained $142 in quarters. When he was arrested later that day the police discovered Michael Ralston's learner's permit in his pocket.

Durden, Wilkerson and Campbell were interrogated separately and each gave corroborating statements about Jenkins' actions and comments on January 8 and 9. The police were able to establish that none of the men had been with Jenkins or in the white van before 11:30 p.m. on the night of the murders. During the time Jenkins was incarcerated prior to conviction, inmate Curtis Mathis saw and heard Jenkins arguing with another prisoner. According to the inmate, Jenkins told the other prisoner that he had "already killed two [people] and it wouldn't bother him again if he killed another one."

The evidence adduced was sufficient to enable a rational trier of fact to find Jenkins guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

### Pretrial Proceedings

2. Jenkins contends the trial court erred in denying his motion to preclude the State from seeking the death penalty due to the alleged unconstitutionality of the prosecutor's criterion for determining when to seek it. The record reflects the position of the district attor-

ney to seek the death penalty in every murder case in which there is a statutory aggravating circumstance, with the exception of cases involving outrageously or wantonly vile, horrible or inhuman circumstances, OCGA § 17-10-30 (b) (7), which are evaluated individually.[2] Jenkins argues that a system where a prosecutor automatically seeks the death penalty if certain statutory aggravating circumstances are present is as arbitrary and unconstitutional as a mandatory sentencing scheme. See *Woodson v. North Carolina*, 428 U. S. 280 (96 SC 2978, 49 LE2d 944) (1976) (statute providing for mandatory death sentence for certain crimes struck down as unconstitutional). Compare *Gregg v. Georgia*, 428 U. S. 153, 199 (96 SC 2909, 49 LE2d 859) (1976) (appellant claimed that exercise of prosecutorial *discretion* made imposition of death sentence wanton and capricious). We disagree. A prosecutor's decision to seek the death penalty is limited by the jury's ultimate decision to impose it. *McClain v. State*, 267 Ga. 378 (12) (477 SE2d 814) (1996). Jenkins has not produced any proof that the district attorney is motivated by anything other than the strength of the evidence.[3]

> Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts.

*Gregg*, supra, 428 U. S. at 225 (White, J., concurring). The U. S. Constitution and Georgia law authorize the death penalty for Jenkins' crimes and Jenkins has failed to show that the prosecutor acted in an unconstitutional manner with respect to his case. *Rower v. State*, 264 Ga. 323 (2) (443 SE2d 839) (1994).

3. Jenkins contends the trial court erred in changing venue to a county tainted by prejudicial pretrial publicity. Jenkins moved for a change of venue beyond a 50-mile radius due to pretrial publicity in Wayne County. The State conceded there had been prejudicial pre-

---

[2] In *State v. Blanks*, Indictment No. 8352, a previous unrelated death penalty pre-trial proceeding conducted in Glynn County on October 30, 1991, this prosecutor stated:

We have gone to great lengths in this community, in this circuit, as this Court has and all the judges have, to eliminate the race of a defendant, the race of a juror, the race of a victim as being any issue in the trial of this case. It makes no difference. The only question that is asked in a death penalty case is, Do you have a statutory aggravating circumstance other than the — I guess it's (b) (7) — cruel and inhumane, involving torture one? If the answer is yes, the death penalty is sought. If the answer is no, the death penalty cannot be sought.

[3] The record in this case only contains a few pages of the pretrial hearing transcript from the previous case. The trial court, though, did review the particular transcript in its entirety before ruling that Jenkins had failed to show that the method of selecting death penalty cases was unconstitutional.

trial publicity in Wayne County and agreed to a venue change, but the parties were unable to reach agreement on the location of the trial. Pursuant to OCGA § 17-7-150 (a) (1), the court ruled that the trial would be moved to neighboring Glynn County. The court noted that the two counties receive their news from different media markets,[4] have a similar racial breakdown, and Glynn County is convenient to the parties and witnesses. Jenkins asserts that this ruling was error because the county seats are only 40 miles apart, the counties share a common border, and 13 prospective Glynn County jurors had heard about or were familiar with the case.

To prevail on his claim, Jenkins had to present sufficient evidence to show that the setting of the trial was inherently prejudicial due to pretrial publicity or that any juror displayed actual prejudice against him. *Jones v. State*, 267 Ga. 592 (1) (a) (481 SE2d 821) (1997). The only evidence proffered by Jenkins that it would be inherently prejudicial to have the trial in Glynn County is that county's proximity to Wayne County and the prosecutor's admission that there had been prejudicial pretrial publicity in Wayne County. This evidence, by itself, does not support Jenkins' assertion that there must have been a "spill-over" of prejudice into Glynn County. With regard to actual bias by prospective jurors, the record reveals that only 13 of 75 prospective jurors could remember hearing any news about the crimes; most of these jurors had only sketchy memories of what had been reported; none had formed a fixed opinion about the case; and Jenkins did not move to strike any jurors for cause due to pretrial publicity. Id.; *Woodbury v. State*, 264 Ga. 31 (3) (440 SE2d 461) (1994). Because there was no proof either that the trial setting in Glynn County was inherently prejudicial or that there was actual bias on the part of jurors, the trial court did not abuse its discretion by changing venue to Glynn County.

4. The trial court correctly denied Jenkins' request for access to the State's juror files. *Wansley v. State*, 256 Ga. 624 (2) (352 SE2d 368) (1987).

5. Jenkins filed a "Motion to Bar Unreliable Testimony of an Informant" before trial, claiming that Curtis Mathis, the inmate who overheard Jenkins say he had killed two people, was unreliable and thus the trial court should suppress Mathis' testimony. The trial court refused to hold a hearing on Mathis' credibility and Jenkins asserts that this was error. We disagree. "The credibility of a witness is a matter to be determined by the jury under proper instructions from the court." OCGA § 24-9-80. In his motion, Jenkins did not

---

[4] The trial court took judicial notice that Wayne County receives its news primarily from Savannah and Glynn County receives its news primarily from Glynn County (Brunswick) and Jacksonville, Florida.

claim that Mathis' testimony violated any rule of evidence or criminal procedure. Instead, the only apparent basis for Jenkins' motion to suppress is his assertion that jailhouse informants are notoriously unreliable. A witness's credibility is for the jury to decide and defendants have the right to challenge this credibility through cross-examination. See OCGA § 24-9-64. It was not error for the trial court to refuse to hold a hearing on Mathis' credibility or to allow Mathis to testify.

6. The trial court correctly denied Jenkins' request for a separate trial on the issue of mental retardation. OCGA § 17-7-131 (c) (3) requires the jury in a capital trial to determine a defendant's mental retardation during the guilt/innocence phase. *Livingston v. State*, 264 Ga. 402 (3) (444 SE2d 748) (1994).

*Jury Selection*

7. Although Jenkins contends that subsections (a) (4) and (c) of OCGA § 15-12-164 are unconstitutional, we need not consider this enumeration of error because Jenkins lacks standing to challenge these subsections on constitutional grounds. *Jefferson v. State*, 256 Ga. 821 (4) (353 SE2d 468) (1987). The death qualification voir dire in this case was more extensive and detailed than that provided by OCGA § 15-12-164 (a) (4) and the record indicates that no potential juror was excused from serving or declared competent to serve based solely on his or her answer to the (a) (4) statutory question.

8. Jenkins argues that the trial court failed to strike six prospective jurors who were predisposed to the death penalty and could not consider mitigating evidence.

> The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"

*Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997). The disqualification of a potential juror need not appear with unmistakable clarity but a juror's specific answers during voir dire are not to be taken out of context because voir dire is viewed as a whole. Id. at 48-49. Appellate courts give deference to a trial court's decision regarding the qualification of a juror. Id.

(a) Juror Hardwick. Hardwick responded to a question about his religious or personal convictions for or against the death penalty by stating, "Either way I'd make my own mind up, an eye for an eye, a tooth for a tooth, something like that." He stated that he was in favor of the death penalty but he did not think any situation was auto-

matic because "you have to look at the whole picture." He could consider mitigating evidence and return a life sentence for a murder/kidnapping. He emphasized that he would base his decision on the "total situation" and "the evidence surrounding the whole case." While he stated that a defendant's youth and childhood in a broken home would not carry much weight with him, he cited a defendant's character as a mitigating factor, stated he could fairly consider both a life and a death sentence and that he would follow the court's instructions. Hardwick's voir dire responses support the trial court's decision that the juror's views would not "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." See *Bishop v. State*, 268 Ga. 286 (6) (486 SE2d 887) (1997); *Waldrip v. State*, 267 Ga. 739 (8) (482 SE2d 299) (1997).

(b) Juror Cope. Cope stated he had no personal views for or against the death penalty, would listen to evidence from both sides before making up his mind, would consider age and mental condition as mitigating factors, and could vote for life even if the defendant was convicted of murder. In response to questioning by Jenkins, Cope said that the State would have to prove guilt beyond a "shadow of a doubt" before he would impose the death penalty and then, if absolute guilt is proven, he would sentence the defendant to death. Jenkins further elicited from Cope his belief that age and a broken home would not really change his mind about sentence and that he could not think of any mitigating factors. Upon further questioning, Cope said that life in prison would be one of his decisions unless a death sentence would be more appropriate and that if a defendant was proven guilty of murder beyond a reasonable doubt, he did not know what sentence he would impose because he "would have to be there" in the sentencing phase. The trial court then elicited from Cope that he could lay aside his opinions and follow the law and the trial court's instructions. Although some answers given by Cope in response to questions about the death penalty were equivocal or ambiguous, this alone does not disqualify a potential juror. *Ledford v. State*, 264 Ga. 60 (6) (439 SE2d 917) (1994). Viewing the voir dire as a whole, the trial court did not abuse its discretion by refusing to strike this juror on reverse-*Witherspoon*[5] grounds. *Bishop*, supra, 268 Ga. at (6).

(c) Juror Wendel. Wendel stated that he had no personal conviction for or against the death penalty, could recommend either life or death if the defendant was convicted, and would consider mitigation evidence if instructed to by the judge. He said he was not strongly opinionated about the death penalty but he believes in it when "it

---

[5] *Witherspoon v. Illinois*, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968).

should be handed out." When asked by Jenkins if he would only consider the death penalty for someone convicted of the intentional killing of two persons, Wendel responded that he would need more facts, of both the crime and the defendant. The trial court asked Wendel if he would consider age, mental retardation, and family history in his sentencing deliberations if he was so instructed and Wendel responded affirmatively. He added that he had no problem with considering these factors but somebody should not get off the death penalty because of them. Later, he stated that he thought life and death are both justifiable punishments and he could not say how he would vote until he saw the case. Considered alone and out of context, Wendel's statement that a defendant's age, mental retardation or family history would not keep him from imposing a sentence of death could show a predisposition to the death penalty. His testimony as a whole, however, does not indicate a predisposition to recommend a sentence of death or that he would not consider proper mitigating evidence if instructed to do so. Accordingly, the trial court was authorized to find that he was qualified to serve as a juror. *Bishop*, supra.

(d) Jurors Hooten, Phillips and Pierce. Jenkins claims that the statements of prospective jurors Hooten, Phillips and Pierce established that they would give no consideration to mitigation evidence and therefore the trial court should have struck them for cause. We disagree as this contention is unsupported by the record. All three jurors indicated that they could recommend a life sentence and that they would consider mitigation evidence. Jenkins pins much of his argument on the inability of two of these jurors to list or enunciate mitigating factors that would be important to their sentencing determination. However, "[a] prospective juror's inability to recite circumstances which might lead her to vote for a life sentence is not dispositive of her qualifications to serve as a juror." *Waldrip*, supra, 267 Ga. at 739 (8) (a). The trial court did not abuse its discretion by refusing to excuse these jurors for cause. *Bishop*, supra.

9. Jenkins claims that three jurors were improperly struck for cause due to their inability to consider fairly a death sentence. *Witherspoon v. Illinois*, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968). The record shows that jurors Hall, Griffin and Watson clearly stated that they could not set aside their personal beliefs against the death penalty and would be unable to return a verdict of death. The trial court was authorized to find that these jurors' views would substantially impair the performance of their duties as jurors in accordance with their instructions and oath. *Wainwright v. Witt*, 469 U. S. 412 (105 SC 844, 83 LE2d 841) (1985); *Greene v. State*, 268 Ga. 47 (485 SE2d 741) (1997).

10. The trial court did not err by excusing a prospective juror due

to a hearing disability. *Bennett v. State*, 262 Ga. 149 (2) (414 SE2d 218) (1992). The record reveals that the juror had to have questions repeated numerous times during voir dire, often gave an answer that did not fit the question, told both the State and defense counsel "I can't hardly hear you," admitted to having a hearing problem, and stated that her hearing disability would be a problem for her as a juror. After she explained to the trial court that she did not have a hearing aid, the court noted her frequent inability to comprehend what was being said in the courtroom and properly excused her as a juror. Id.

11. Jenkins contends that the State violated *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986) and *J.E.B. v. Alabama*, 511 U. S. 127 (114 SC 1419, 128 LE2d 89) (1994) in the exercise of its peremptory strikes. In total, the State struck three men and seven women. Five out of its ten peremptory strikes were used to remove African-Americans from the jury panel and one of its two strikes to remove an African-American alternate juror. The trial court ruled that the disparity did not establish a prima facie case of race or gender discrimination, but nevertheless allowed the State to provide its reasons for striking the prospective jurors.

Pretermitting the propriety of the trial court's ruling on the existence of a prima facie case, we find no error in the trial court's determination that the explanations articulated by the State were sufficient to rebut a prima facie case of discrimination under *Batson* and *J.E.B*. See *Davis v. State*, 263 Ga. 5 (10) (426 SE2d 844) (1993). The prosecutor explained that he struck six of the jurors because they had expressed reservations about imposing the death penalty. "A prospective juror's conscientious aversion to the imposition of the death sentence is an adequate reason to justify a peremptory strike in a death-penalty case." *Tharpe v. State*, 262 Ga. 110 (6) (416 SE2d 78) (1992). Two jurors were struck because they had relatives who had been prosecuted by the district attorney's office. The criminal history of a prospective juror's family is a sufficiently neutral reason to justify a peremptory strike. See *Davis*, supra; *Batton v. State*, 260 Ga. 127 (2) (391 SE2d 914) (1990). Mental retardation was an issue in the case and the State stated that it struck two jurors because they had children who were mentally impaired. " 'Unless a discriminatory intent is inherent in the . . . proponent's explanation [for a strike], the reason offered will be deemed race neutral.' [Cits.]" *Jackson v. State*, 265 Ga. 897, 898 (2) (463 SE2d 699) (1995). As the record supports the State's race and gender neutral reasons for striking the jurors in question, we find no error.

12. Contrary to Jenkins' contention, the trial court did not improperly restrict the scope of voir dire. Jenkins claims that he was prevented from asking questions to the prospective jurors about the

OJ Simpson case, their understanding of the definition of a "life sentence," whether they would "help" a person with mental difficulties, and how much weight they would give a defendant's background in sentencing. The record shows that Jenkins was often able to elicit the information he sought by rephrasing the question. Furthermore, the scope of voir dire is largely left to the trial court's discretion and the voir dire examination in this case was broad enough " 'to ascertain the fairness and impartiality of the prospective jurors.' [Cit.]" *Hall v. State*, 259 Ga. 412, 414 (1) (383 SE2d 128) (1989).

13. Jenkins claims that the trial court erred by allowing the State to ask a question to two prospective jurors that called for them to prejudge the case. A review of the record shows that the trial court did not abuse its discretion with regard to the scope of the first juror's voir dire. Id. Moreover, any error would be harmless because the State used one of its peremptory challenges to remove this juror. Jenkins' argument regarding a question posed to the second juror is waived because he failed to object at trial. *Earnest v. State*, 262 Ga. 494 (1) (422 SE2d 188) (1992).

14. We find no error in the trial court's enforcement of a subpoena requiring the defense's psychological expert, Dr. William Dickinson, to provide to the State copies of Jenkins' test scores, the psychologist's answer sheets and WISC III testing manual. Dr. Dickinson tested Jenkins and proffered his opinion that based on his IQ Jenkins was mentally retarded. Jenkins claims that the subpoena exceeded the scope of permissible discovery. The record reveals that Jenkins produced these materials without objection or an attempt to quash the subpoena. It is axiomatic that error not raised in the trial court will not be reviewed on appeal. *Earnest*, supra, 262 Ga. 494 at (1).

### Guilt/Innocence Phase

15. The trial court did not err by failing to grant a directed verdict on the issue of Jenkins' mental retardation. A directed verdict was not warranted because the evidence regarding Jenkins' mental ability was disputed and conflicting. OCGA § 17-9-1 (a).

16. Jenkins contends that the prosecutor made improper and misleading comments regarding Jenkins' mental retardation during his opening statement and closing argument. Because Jenkins failed to raise any objection to the State's opening statement, we need only determine whether there is a reasonable probability the improper argument changed the outcome of the trial. *Todd v. State*, 261 Ga. 766 (2) (a) (410 SE2d 725) (1991).

During both opening statement and closing argument the prosecutor commented on Jenkins' mental capabilities by referring to his

mental "competence." Jenkins contends that the prosecutor's use of the term "competence" and references to his ability to distinguish right and wrong when these issues were not relevant to the trial improperly misled the jury as to Jenkins' claim of mental retardation. Viewed in context, however, we find the prosecutor's statements were not designed to confuse the jury but were part of the prosecutor's overall argument that Jenkins' conduct evidenced a mental capability inconsistent with mental retardation.

We find no error sufficient to overcome Jenkins' procedural default in failing to object to the State's opening statement. Id. at (b). We also conclude that the prosecutor's comments during closing argument, when viewed in context, were relevant to the evidence and within the range of permissible argument. *Conner v. State*, 251 Ga. 113 (6) (303 SE2d 266) (1983).

17. The jury was properly charged by the trial court that in order to arrive at a finding of "guilty but mentally retarded," Jenkins had the burden of proving beyond a reasonable doubt that he was mentally retarded. *Burgess v. State*, 264 Ga. 777, 789 (36) (450 SE2d 680) (1994).

18. Although the trial court examined the State's file before trial, Jenkins contends that the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). Jenkins claims that the State should have provided him with (1) a deputy's notes that stated that the deputy had tried to locate a suspect named Michael Woods in the first hours of the murder investigation; (2) the written statements of Durden, Wilkerson and Campbell, i.e., the three men who had been with Jenkins in the van; (3) an investigator's notes about two witnesses who claimed to have seen a white woman on the night of the murders driving a white van containing more than one black male; and (4) an investigator's notes about a witness who saw Wilkerson, not Jenkins, with the .22 Grendel pistol.

Jenkins has failed to establish that any of the above evidence, even if exculpatory, was revealed too late to prevent him from receiving a fair trial. See *Parks v. State*, 254 Ga. 403 (3) (330 SE2d 686) (1985). The deputy's notes were provided to Jenkins at trial and Jenkins cross-examined the deputy about Michael Woods being a suspect early in the investigation.[6] A *Brady* violation does not exist where the information sought by the defendant becomes available at trial. *Davis v. State*, 266 Ga. 801 (2) (471 SE2d 191) (1996). Similarly, during trial of the case, defense counsel was informed by the trial court

---

[6] It is apparent from the testimony of trial witnesses that Michael Woods (with Jenkins) had been a suspect in the burglary of a home where several guns, including the murder weapon, were stolen.

of any inconsistencies between the trial testimony of Durden, Wilkerson and Campbell and their previous written statements. Jenkins' claims of error as to the witnesses who saw the white van and Wilkerson with the gun are unavailing as the transcript reveals the defense called upon these witnesses to testify at trial and thus clearly had to be aware of the substance of their testimony before trial.[7] We find no *Brady* violation. Id.; *Parks*, supra.

19. Jenkins claims that the State violated *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972) in failing to reveal deals with four witnesses: Mathis (the jailhouse informant), Durden, Wilkerson, and Campbell. We disagree as there is no evidence to support Jenkins' assertion that the State withheld any information as to any agreements with these four witnesses. The State maintained and Mathis testified that no deals had been made in exchange for his testimony. As to the other three witnesses, Jenkins was informed that the State had granted Durden, Wilkerson and Campbell use and derivative-use immunity for their testimony one day after the immunity was extended, which was three days before the start of trial and ten days before the witnesses testified. Jenkins cross-examined Durden and Wilkerson as to any agreement with the State, see *Shearer v. State*, 259 Ga. 51 (2) (376 SE2d 194) (1989), and the trial court instructed the jury on the meaning of immunity. There is also no merit to Jenkins' assertion that the State "sandbagged" him by the late disclosure of the immunity agreements as the evidence shows that Jenkins was informed within a day after the immunity was granted. As no information was withheld and Jenkins exercised the opportunity to cross-examine the witnesses on the issue of promises made by the State, no violation of *Giglio*, supra, occurred.

20. The trial court did not err by admitting seven photographs of the bodies of Terry and Michael Ralston. The photos were taken before autopsy and depict the nature and location of the victims' wounds. Photographs of a victim's body, taken before autopsy, are generally admissible. *Baxter v. State*, 254 Ga. 538 (8) (a) (331 SE2d 561) (1985). The photographs were relevant and not duplicative.

### Sentencing Phase

21. We find no error in the trial court's refusal to instruct the jury on the meaning of a life sentence. *Jones v. State*, 263 Ga. 904 (1) (440 SE2d 161) (1994). Likewise, a defendant's parole eligibility in cases where life without parole is not an option is inadmissible. *Phil-*

---

[7] Before trial, the State provided Jenkins with a list of witnesses resulting from its investigation. These witnesses were on that list.

*pot v. State*, 268 Ga. 168 (2) (486 SE2d 158) (1997); *Burgess*, supra, 264 Ga. at 788 (33). Jenkins' reliance on *Simmons v. South Carolina*, 512 U. S. 154 (114 SC 2187, 129 LE2d 133) (1994), is misplaced. *Burgess*, supra.

22. The trial court did not err by denying Jenkins' pretrial motions requesting permission to address the jury prior to deliberation in the sentencing phase or, in the alternative, for permission to take the stand and testify but have cross-examination limited to only those issues covered on direct examination. A defendant does not have the right to make an unsworn statement during the sentencing phase of a death penalty trial. *Isaacs v. State*, 259 Ga. 717, 737 (40) (386 SE2d 316) (1989). A defendant may choose to testify, but "[i]f a defendant testifies, he shall be sworn as any other witness and may be examined and cross-examined as any other witness." OCGA § 24-9-20 (b).

23. Jenkins raises several enumerations regarding the statutory aggravating circumstances.

(a) Among the nine statutory aggravating circumstances on which the jury based its recommendation of the two death sentences were two mutually-supporting aggravating circumstances, namely, that the murder of Terry Ralston took place during the murder of Michael Ralston and that the murder of Michael Ralston took place during the murder of Terry Ralston. OCGA § 17-10-30 (b) (2). The doctrine of mutually-supporting aggravating circumstances precludes the use of one murder to support the death penalty for a second murder and the use of the second murder to support the death penalty for the first murder. *Wilson v. State*, 250 Ga. 630 (9) (300 SE2d 640) (1983). Accordingly, we set aside the statutory aggravating circumstance that the murder of Michael Ralston occurred during the murder of Terry Ralston. However, no reversal of either death sentence is required because we find that each death sentence remains based on other valid statutory aggravating circumstances. Id.

(b) Jenkins argues that it was improper for the State to submit statutory aggravating circumstances to the jury when some of the aggravating circumstances were mutually supporting. Jenkins claims that this procedure resulted in an unfair accumulation of aggravating factors that may have prejudiced the jury towards a death verdict. We disagree. A prosecutor is permitted to present all statutory aggravating circumstances supported by the evidence to the jury. See OCGA § 17-10-30 (b) (trial judge "shall include in his instructions to the jury for it to consider . . . any of the following [ten] aggravating circumstances which may be supported by the evidence"). Moreover, Georgia is not a weighing state and juries here are not instructed to view multiple aggravating circumstances more

harshly than a single aggravating circumstance or to balance aggravating and mitigating factors. See *Simpkins v. State*, 268 Ga. 219 (2) (486 SE2d 833) (1997).

(c) Jenkins argues that four of the statutory aggravating circumstances cannot stand because the aggravating offense listed on the jury verdict form is "kidnapping" and not "kidnapping with bodily injury." Simple kidnapping cannot serve as a statutory aggravating circumstance under OCGA § 17-10-30 (b) (2). *Crawford v. State*, 254 Ga. 435 (5) (330 SE2d 567) (1985). The record, however, supports the jury's finding of kidnapping with bodily injury as to the four statutory aggravating circumstances. The indictment specifies that bodily harm was done to the victims during the kidnappings and the trial court charged the jury in both the guilt/innocence and sentencing phases on kidnapping with bodily injury, specifically setting out the elements of kidnapping with bodily injury.[8] We therefore conclude that the jury convicted Jenkins of kidnapping with bodily injury and found kidnapping with bodily injury as a supporting offense for each OCGA § 17-10-30 (b) (2) aggravating circumstance. Accord *Potts v. Zant*, 734 F2d 526, 530 (11th Cir. 1984) ((b) (2) aggravating circumstance involving "kidnapping" invalid where trial court omitted any reference to "bodily injury" in guilt/innocence and sentencing phase jury charge).

(d) Jenkins alleges that the OCGA § 17-10-30 (b) (4) aggravating circumstances, i.e., that the murders were committed for the purpose of receiving money, were subsumed by the (b) (2) aggravating circumstance involving armed robbery. This issue was decided adversely to Jenkins in *Simpkins*, supra, 268 Ga. at 220 (2), in which we held that subsections (b) (2) and (b) (4) refer to separate and distinct statutory aggravating circumstances; the (b) (4) aggravating circumstance refers to the motive for the killing and the (b) (2) aggravating circumstance refers to the manner in which the victim was killed. *Simpkins*, supra. As in *Simpkins*, under the facts of this case, the evidence authorized a finding of both the (b) (2) and (b) (4) aggravating circumstances.

24. Jenkins contends that the trial court erred by failing to charge the jury that they could recommend mercy. See OCGA § 17-10-2 (c). The record shows that the trial court instructed jurors that they could consider mitigating evidence or any circumstances in mitigation; that they could return a life sentence for any reason or no reason at all; and that they could consider "feelings of sympathy and mercy that flow from the evidence." As a whole, the trial court sufficiently instructed the jury on the issues of mercy and mitigation and

---

[8] The jury was also provided with a copy of the court's charge during their deliberations.

informed the jury that it could return a life sentence, regardless of the aggravating evidence. *Spivey v. State*, 241 Ga. 477, 481 (246 SE2d 288) (1978).

25. We find no error in the trial court's refusal to instruct the jury that they could consider residual doubt of Jenkins' guilt as a mitigating factor. "It is well-settled that a trial court is not required in its charge to 'identify mitigating circumstances offered by the defendant.' [Cit.]" *Taylor v. State*, 261 Ga. 287, 295 (11) (404 SE2d 255) (1991).

26. The trial court did not err by refusing to give several of Jenkins' requested jury charges in the sentencing phase. As to Jenkins' requested charge that lack of unanimity by the jury would result in a life sentence, it is well settled that a trial court is not required to charge the jury about the consequences of deadlock. *Burgess*, supra, 264 Ga. at 789 (35); *Harris v. State*, 263 Ga. 526 (6) (435 SE2d 669) (1993). As to several requested charges involving the individualized determination by each juror of the appropriateness of the sentence, the record shows that the substance of these requested charges was essentially covered by the charge given by the court. *Taylor*, supra, 261 Ga. at 295 (12); *Jefferson*, supra, 256 Ga. at 825 (5). Jenkins' remaining requested charge contained the statement that he had a presumption of a life sentence in the penalty phase. Although the trial court did not use the exact language requested by Jenkins, the jury was properly instructed that they could return a death verdict only if the State proved the existence of at least one statutory aggravating circumstance beyond a reasonable doubt. Accordingly, the trial court's instructions on the State's burden of proof in the sentencing phase were sufficient. See *Ward v. State*, 262 Ga. 293 (29) (417 SE2d 130) (1992).

27. Jenkins complains that the State made three improper statements during the closing argument in the penalty phase.

(a) The State argued that sentencing Jenkins to death "tells anybody that wants to follow in his footsteps that we will not stand for that in this community or any other community." This argument is not improper. *McClain*, supra, 267 Ga. at 385 (4).

(b) The prosecutor began his opening statement in the guilt/innocence phase with a quote he attributed to a former judge: "When I go to bed at night, I dream that life is beauty, and when I wake up in the morning, I find that life is duty." The prosecutor repeated this quote at the start of his closing argument in the sentencing phase and added:

> [the quote] illustrates where we are and what we are here to do today, and that is to do our duty. We are to discuss and think about and decide on something for everyone in this

courtroom. So deep, and serious, and important that it requires all our best effort.

At the conclusion of his closing argument, the prosecutor again repeated the former judge's quote and added, "I ask you to do your duty."

Jenkins complains that these comments constituted an improper argument on the "war on crime" and amounted to a statement telling the jury that it was their duty to convict him. We disagree. The duty argument, viewed as a whole, is best characterized as the prosecutor's attempt to impress upon the jury the gravity and importance of their sentencing task. The State is "afforded 'considerable latitude in imagery and illustration' in reminding the jury of its responsibilities in enforcing the law. [Cits.]" Id.

(c) A defendant's lack of remorse is a permissible area of argument during the sentencing phase of a capital trial. *Carr v. State*, 267 Ga. 547 (8) (d) (480 SE2d 583) (1997).

28. Jenkins' argument that execution by electrocution is unconstitutional under the Federal or State constitutions has previously been ruled upon and resolved adversely to him. *Stripling v. State*, 261 Ga. 1 (8) (401 SE2d 500) (1991).

29. The sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentence is also not excessive or disproportionate to the sentences imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of the death penalty in this case in that these cases involved one or more deliberate, unprovoked killings during a kidnapping with bodily injury and/or armed robbery and show that juries are willing to impose the death penalty under these circumstances.

*Judgment affirmed. All the Justices concur, except Benham, C. J., and Fletcher, P. J., who dissent.*

### APPENDIX.

*Bishop v. State*, 268 Ga. 286 (486 SE2d 887) (1997); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Waldrip v. State*, 267 Ga. 739 (482 SE2d 299) (1997); *McClain v. State*, 267 Ga. 378 (477 SE2d 814) (1996); *Jones v. State*, 267 Ga. 592 (481 SE2d 821) (1997); *Christenson v. State*, 262 Ga. 638 (423 SE2d 252) (1992); *Tharpe v. State*, 262 Ga. 110 (416 SE2d 78) (1992); *Meders v. State*, 261 Ga. 806 (411 SE2d 491) (1992); *Potts v. State*, 261 Ga. 716 (410 SE2d 89) (1991); *Ferrell v. State*, 261 Ga. 115 (401 SE2d 741) (1991); *Stripling v. State*, 261 Ga. 1 (401 SE2d 500) (1991); *Romine v. State*, 256 Ga. 521 (350 SE2d

446) (1986); *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986); *Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984).

FLETCHER, Presiding Justice, dissenting.

1. I dissent to divisions 6 and 17 because I conclude that requiring a capital defendant to prove mental retardation beyond a reasonable doubt in the guilt-innocence phase is fundamentally unfair and I would hold that the issue should be resolved in a pre-trial hearing with "preponderance of the evidence" as the burden of proof.

(a) The question in this case is whether "procedures for guaranteeing a fundamental constitutional right are sufficiently protective of that right."[9] This Court has previously held that subjecting a mentally retarded defendant to the death penalty offends the prohibition in the Georgia Constitution against cruel and unusual punishment.[10] A right rooted in our state constitution and protected by statute[11] is certainly "fundamental."[12] Jenkins argues that using "beyond a reasonable doubt" as the burden of proof to establish mental retardation fails to protect this right. Although *Mosher v. State*[13] addresses this issue, further analysis convinces me that we decided this issue incorrectly in that case. In order to determine whether a procedural rule governing a fundamental constitutional right sufficiently protects that right, we must look at the historical[14] and contemporary practice,[15] as well as whether the operation of the rule demonstrates "fundamental fairness."[16]

Because the classification of mental retardation is a modern concept, there can be no precision in determining the historical procedural burden. The common law idea most closely related to mental retardation is "idiocy."[17] That concept also encompasses the distinct issues of insanity and competency to stand trial that courts employ today.[18] In *Cooper v. Oklahoma*,[19] the United States Supreme Court

---

[9] *Cooper v. Oklahoma*, 517 U.S. 348 (116 SC 1373, 1383, 134 LE2d 498) (1996).

[10] *Fleming v. Zant*, 259 Ga. 687 (386 SE2d 339) (1989).

[11] O.C.G.A. § 17-7-131 (j).

[12] That the United States Supreme Court reached a different conclusion in *Penry v. Lynaugh*, 492 U.S. 302 (109 SC 2934, 106 LE2d 256) (1989) under the federal constitution serves only to illuminate the principle that the federal constitution affords minimal protections that the states are free to broaden. *Pope v. City of Atlanta*, 240 Ga. 177, 178, n. 1 (240 SE2d 241) (1977).

[13] 268 Ga. 555, 558-560 (4) (491 SE2d 348) (1997).

[14] *Cooper*, 116 SC at 1377 ("Historical practice is probative of whether a procedural rule can be characterized as fundamental."), quoting *Medina v. California*, 505 U.S. 437, 446 (112 SC 2572, 120 LE2d 353) (1992).

[15] Id. at 1380.

[16] Id. at 1380, quoting *Medina*, 505 U.S. at 448.

[17] See *Penry*, 492 U.S. at 332.

[18] See id. at 331-333 and *Cooper*, 116 SC at 1377-1378.

[19] *Cooper*, 116 SC at 1378.

concluded that historically the procedural burden for determining competency to stand trial was a preponderance of the evidence. That Court, in another case, noted that historically the defendant was required to prove insanity "clearly," but that some courts construed this as a reasonable doubt standard and others as a preponderance of the evidence standard.[20] The historical analysis, therefore, leads to no certain conclusions.

A review of contemporary practice, however, provides more guidance. Currently 11 states plus the federal government expressly prohibit the execution of the mentally retarded.[21] None of the other jurisdictions that prohibit the execution of the mentally retarded require proof beyond a reasonable doubt as does Georgia.[22] Only two jurisdictions require proof by any standard higher than a preponderance of the evidence.[23] Another significant difference between Georgia's procedure and that of other jurisdictions is that Georgia places this highest standard on the defendant in the guilt-innocence phase.[24]

The fact that other jurisdictions almost uniformly use a standard significantly more protective of defendant's rights strongly supports the conclusion that Georgia's reasonable doubt standard is unconstitutional. As the United States Supreme Court noted in *Cooper*, "[t]he near-uniform application of a standard that is more protective of the defendant's rights . . . supports our conclusion that the heightened standard offends a principle of justice that is deeply 'rooted in the traditions and conscience of our people.' "[25]

The final consideration is whether the operation of the rule demonstrates "fundamental fairness."[26] In making this determination we must balance the interests of the state and defendant,[27] recognizing that the burden of proof "indicate[s] the relative importance attached

---

[20] *Leland v. Oregon*, 343 U.S. 790, 797, n. 14 (72 SC 1002, 96 LE 1302) (1952).

[21] See statutes cited in n. 14. Nine of these states have passed these provisions since the *Penry* decision. See *Penry*, 492 U.S. at 334 (Noting that at time of decision only Georgia and Maryland prohibited the execution of the mentally retarded). Another 12 states and the District of Columbia have no death penalty law.

[22] Ark. Stat. Ann. §§ 5-4-618 (d) (2); Colo. Rev. Stat. §§ 16-9-402, 16-9-403 (2); O.C.G.A. § 17-7-131 (c) (3), (j); Ind. Code Ann. §§ 35-36-9-4, 35-36-9-6; Kan. Stat. Ann. § 21-4623 (d); Ky. Rev. Stat. Ann. §§ 532.140, 532.135 (2); Md. Code Ann. Crim. Law (Art. 27) § 412 (g); N.M. Stat. Ann. § 31-20A-2.1 (C); N.Y. Crim. Proc. § 22-B 400.27 (12) (c) and (e); Tenn. Code Ann. § 39-13-203 (c); Wash. Rev. Code § 10.95.030 (2); 18 U.S.C. § 3596 (c) and 21 U.S.C. § 848 (l).

[23] Colo. Rev. Stat. § 16-9-402 (2) and Ind. Code Ann. § 35-36-9-4 (clear and convincing). The standard of proof is not specified by statute in Kansas, Kentucky, or the federal courts and research has not revealed any cases on the issue.

[24] See discussion infra at 1 (b).

[25] *Cooper*, 116 SC at 1380, quoting *Medina*, 505 U.S. at 445.

[26] *Cooper*, 116 SC at 1380, quoting *Medina*, 505 U.S. at 448.

[27] Id. at 1382.

to the ultimate decision."[28] The consequences of an erroneous decision for the defendant are obvious and critical. On the other hand, an incorrect decision in no way frustrates the state's interest in enforcing its criminal laws or in punishing violators of those laws;[29] at most, the state will not be able to exact the ultimate punishment. Furthermore, the risk of a wrong decision through the defendant's feigning mental retardation does not justify resort to the highest burden of proof. To establish mental retardation, a defendant must produce expert evidence of significant subaverage intellectual functioning, as well as evidence that the subaverage functioning results in or is associated with impairments in adaptive behavior and that the behavior impairment manifested during the developmental period.[30] Georgia's narrow definition of mental retardation, the requirement of expert testimony, and the fact that the defendant bears the burden on the issue is sufficient to protect the state's interest in preventing malingerers from feigning mental retardation.

These considerations convince me that the beyond a reasonable doubt standard is fundamentally unfair, and, consistent with the majority of states that also prohibit execution of the mentally retarded, I would require the defendant to meet his burden by a preponderance of the evidence.

*Leland v. Oregon*,[31] which upheld requiring the defendant to prove insanity beyond a reasonable doubt, does not require a different result. Insanity, if proved, would relieve the defendant of criminal responsibility for his act.[32] Thus, the state's interest in punishing criminal law violations would be frustrated entirely, unlike the present case where the state's interest in punishment is satisfied by the imposition of a life sentence. Additionally, the standard for proving insanity in Oregon at the time of the *Leland* decision was much less stringent than Georgia's current requirements to establish mental retardation.[33]

(b) In division 6, the majority upholds the denial of a request for a pre-trial hearing on the issue of mental retardation. Jenkins contends that by forcing a defendant to try a sentencing issue in the guilt-innocence phase, Georgia's procedure fails to accord the protec-

---

[28] *Addington v. Texas*, 441 U.S. 418, 423 (99 SC 1804, 60 LE2d 323) (1979).

[29] O.C.G.A. § 17-7-131 (j) (finding of mental retardation requires imposition of life sentence).

[30] O.C.G.A. § 17-7-131 (a) (3).

[31] *Leland*, 343 U.S. at 790. By contrast, Georgia requires a defendant to prove insanity by a preponderance of the evidence. *Lawrence v. State*, 265 Ga. 310, 312-313 (454 SE2d 446), *cert. denied*, 516 U.S. 874 (116 SC 200, 133 LE2d 134) (1995).

[32] *Leland*, 343 U.S. at 794.

[33] See *State v. Wallace*, 131 P.2d 222 (Or. 1942) (insanity may be proved by conduct of person).

tions recognized as vital in *Gregg v. Georgia*.[34] Although the majority relies on *Livingston v. State*,[35] that case did not specifically address the constitutional challenge Jenkins raises. The record developed in this case, which was not available when *Livingston* was decided on interim review, bears out the problems inherent in this procedure. Furthermore, no other jurisdiction requires the defendant to prove mental retardation in the guilt-innocence phase.[36] Finally, the merit of a pre-trial determination, as other states require, is obvious: it prevents confusion, reduces prejudice, and may vastly simplify the trial of the case.

2. I also dissent to division 23 (d) because under the facts of this case it is neither logical nor fair to charge both the (b) (4) and (b) (2) aggravating circumstances since they refer to identical aspects of the crime.[37]

I am authorized to state that Chief Justice Benham joins in this dissent.

DECIDED FEBRUARY 23, 1998 —
RECONSIDERATIONS DENIED APRIL 2, 1998.

*Jackson & Schiavone, G. Terry Jackson, Pattie J. Williams, Steven L. Sparger, Howard, Carswell & Bennett, Kenneth R. Carswell,* for appellant.

*Stephen D. Kelley, District Attorney, John B. Johnson III, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Paige R. Whitaker, Beth Attaway, Assistant Attorneys General,* for appellee.

---

[34] 428 U.S. 153 (96 SC 2909, 49 LE2d 859) (1976).

[35] 264 Ga. 402, 406 (444 SE2d 748) (1994).

[36] Most jurisdictions provide for separate hearing pre-trial or pre-sentencing. Ark. Stat. Ann. § 5-4-618 (d) (2); Colo. Rev. Stat. § 16-9-402 (2); O.C.G.A. § 17-7-131; Ind. Code Ann. § 35-36-9-5; Kan. Stat. Ann. § 21-4623 (d); Ky. Rev. Stat. Ann. § 532.135 (2); N.M. Stat. Ann. § 31-20A-2.1 (C); N.Y. Crim. Proc. § 22-B 400.27 (12) (e). See also *State v. Smith*, 893 S.W.2d 908, 916, n. 2 (Tenn. 1994) (preferable to have pre-trial hearing), *cert. denied*, 516 U.S. 829 (116 SC 99, 133 LE2d 53) (1995). In Maryland mental retardation is determined in the sentencing phase. See *Richardson v. State*, 630 A.2d 238 (IV) (Md. 1993). The procedure in the federal courts and in Washington are not specified by statute and have yet to be established by caselaw.

[37] See *Simpkins v. State*, 268 Ga. 219, 223 (486 SE2d 833) (1997) (Fletcher, P. J., concurring specially).