## S91P0294. TAYLOR v. THE STATE.
(404 SE2d 255)

BENHAM, Justice.

The appellant, Keith Bryan Taylor, was convicted by a jury and sentenced to die for the murder of his wife Lori Taylor.[1]

1. The Taylors moved into an apartment in Blackshear in July of 1986. Two years later, in August of 1988, Lori Taylor removed Keith Taylor's name from the lease and changed the locks. After that time, according to the apartment manager, Keith Taylor "wasn't supposed to be living there." However, Keith Taylor apparently moved back into the apartment sometime before January 12, 1989. On that date, Lori Taylor's cousin drove Lori and Keith Taylor and their two children first to a pawn shop and then to the Pierce County Courthouse. Lori Taylor reported that her husband had threatened her and obtained a "good-behavior warrant." It was agreed that Keith Taylor would collect his personal effects from the apartment and move out. Lori Taylor rode back to the apartment with her cousin, while Keith Taylor walked the two blocks or so to the apartment with the two children. Less than ten minutes later, a police officer drove to the apartments, to check on the situation following the issuance of the good-behavior warrant. When he arrived, the children were locked out of the apartment. The victim's cousin had heard the victim saying, "Keith, don't do it." The officer knocked on the door. Keith Taylor answered. There was blood on his jacket and his hands were "dripping" with blood. He told the officer to take him to jail.

Lori Taylor was still alive, but died after the arrival of emergency medical technicians. The autopsist testified that she had suffered painful but non-fatal wounds to her head, chest and back. In addition, she had suffered a potentially fatal stab wound deep enough to penetrate her pleural cavity which was two-thirds filled with blood

---

[1] The crime occurred on January 12, 1989. The defendant was arrested the same day. After the original indictment was quashed, Taylor was re-indicted on May 14, 1990. The trial began September 24, 1990. The jury reached its verdict as to sentence on September 28, 1990. The court issued its written sentence, in accordance with the jury's verdict, on October 1, 1990. No motion for new trial was filed. The case was docketed in this court November 30, 1990. The case was argued orally on February 11, 1991.

when he conducted the autopsy. Her death was caused by a number of slash wounds which cut her neck practically from ear to ear, completely severed her trachea and reached "completely back to the front part of the cervical spine, or spinal column." The autopsist stated he could not say "exactly how many cuts were involved in making these wounds" because some cuts overlapped others and some likely "obliterated" others, but he could count "at least the beginning of six individual trails of incised wounds" in one of the two large gaping wounds "one above the other" in the neck. All the wounds appeared to have been inflicted before death.

A bloody knife was found in the front hall closet of the apartment. Keith Taylor's son identified the knife as one the defendant owned.

The evidence supports the jury's finding that Keith Taylor killed his wife. The defendant's primary defense was his mental condition. Although not conceding that he was the person who had committed the crime, he contended he was insane at the time of the crime or at least was mentally ill at the time of the crime.

Taylor testified on his own behalf at trial. He had been in the army for nine years. He had psychological and substance abuse problems while in the army and was discharged in 1984 after he refused to obey a direct order by a superior officer. After his discharge, he experienced considerable difficulty obtaining and keeping a job. He worked for three months with the City of Blackshear in 1986, but was terminated when he was injured on the job.

Taylor testified that upon his return to the apartment from the Pierce County Courthouse, he looked for his wife because he did not understand what she was doing. He found no one in the apartment except possibly his son. Then he heard someone knocking at the front door. When he opened the door, he saw the policeman. He knew something was wrong because he (Taylor) had blood on his hands.

Taylor had been evaluated in April of 1987 by a psychologist in connection with Taylor's application for social security disability benefits. The "diagnostic impressions" of the psychologist were "borderline intellectual functioning, schizophrenia, paranoid, chronic." He also described Taylor as being "manipulative, self-serving and capricious," as capable of sudden mood changes, and as being an individual who had "little in the way of incentive or ambition" and showed "no evidence of hallucinations, illusions, notions of grandiosity, ideas of reference or influence, thought broadcasting, flights of ideas, thought blocking, mania/hypomania, depersonalization, derealization, a poverty of emotion or bizarre ideation."

Taylor was counseled in 1987 and 1988 at the Satilla Community Mental Health Clinic. Two of his counselors (neither of whom were psychologists — both had master's degrees in theology) testified at

trial that, based on Taylor's self-reported auditory hallucinations, they initially diagnosed him as being paranoid schizophrenic. They counseled with the defendant about his drug, alcohol and gambling problems, and his inability to obtain work. One of the counselors testified that Taylor was a "spoiled brat" determined to "get his way."

A psychiatrist connected with the clinic testified that she saw the defendant in February of 1989 (after the crime occurred), and diagnosed "cocaine abuse, alcohol abuse, borderline intellectual functioning, schizoid personality and paranoid personality." She did not diagnose paranoid schizophrenia, noting that cocaine abuse could "mimic" that disorder. She acknowledged that before the defendant's arrest she had signed an "adjudication letter" containing a diagnosis of "malingering and substance abuse" and a report that Taylor attempted to use "mental illness to keep from facing responsibility when he gets into trouble."

A clinical forensic psychologist was retained with court-provided funds to evaluate the defendant after his arrest. He interviewed the defendant at jail and reviewed his medical history. He concluded that Taylor "suffers from a paranoid schizophrenic disorder." In his opinion, Taylor was not malingering. He was, however, unable to administer a battery of written psychological tests because Taylor refused to take them. He testified that Taylor ordinarily was capable of differentiating right from wrong, but that in connection with his wife he "would have severe limits in his ability to differentiate right and wrong."

The senior forensic psychologist for the Georgia Regional Hospital in Savannah evaluated Taylor. He testified for the state that in his opinion the defendant did not suffer from any serious mental disorder. In addition, the physician assigned to the jail testified that he had treated Taylor for physical ailments on several occasions at the jail and did not observe Taylor behaving in an unusual manner.

(a) The defendant objected to the testimony of the state's "psychologist" from the Georgia Regional Hospital in Savannah. His objections were that the witness held a Ph.D. degree in counseling, rather than psychology, that he was not an expert clinical psychologist, and was not qualified to render an expert opinion about the defendant's mental condition.

The witness testified that he held a bachelor's degree in psychology, a master's degree in rehabilitation counseling and a Ph.D. degree in counseling with emphasis in corrections and correctional counseling. His master's degree coursework consisted of approximately one-third counseling courses, one-third psychology courses and one-third electives. His doctorate coursework was equally divided between psychology and counseling coursework with no electives. He has post-degree training in forensic evaluations, is employed as a senior forensic

psychologist by the state, and belongs to the American Psychological Association, the Georgia Psychological Association, the Coastal Association of Psychologists, and the American College of Forensic Psychology. He has conducted over 300 psychological evaluations for superior courts in this state, and has been declared an expert witness in the field of forensic psychology in both state and federal courts.

This court has held that

> the trial judge has a discretion in accepting or rejecting the qualifications of the expert, and his judgment in that respect will not be disturbed on appeal unless abused. . . . "To qualify as an expert . . . generally all that is required is that a person must have been educated in a particular skill or profession: his special knowledge may be derived from experience as well as study. [Cits.] Formal education in the subject at hand is not a prerequisite for expert status." *Bowden v. State*, 239 Ga. 821, 826 (3) (238 SE2d 905) (1977) (cert. den. 435 U. S. 937) (1978); [cits.]. [*Brown v. State*, 245 Ga. 588, 589-590 (1) (266 SE2d 198) (1980).]

The trial court did not err by overruling the defendant's objection to the expertise of this witness, or by allowing the witness to testify as an expert witness in the field of forensic psychology.

(b) The defendant claims a violation of OCGA § 17-7-130.1, which provides, in part:

> When notice of an insanity defense is filed, the court shall appoint at least one psychiatrist or licensed psychologist to examine the defendant and to testify at trial. This testimony shall follow the presentation of the evidence for the prosecution and for the defense, including testimony of any medical experts employed by the state or by the defense. The medical witnesses appointed by the court may be cross-examined by both the prosecution and the defense. . . .

The defendant argues that the Code was violated in two respects. First, there is no evidence in the record that the psychologist appointed by the court to examine the defendant was a *licensed* psychologist. Second, he was called as a witness by the state instead of by the court.

These objections were not raised by the defendant at trial. Absent timely objection, we find no reversible error.[2]

---

[2] Since there was no objection at trial, we need not decide whether a party is precluded from calling the "court's" witness as its own or whether, if the party does so, the court must

(c) The defendant argues the evidence demands a finding of not guilty by reason of insanity or, at least, guilty but mentally ill. We do not agree. The evidence, viewed in the light most favorable to the state, supports the jury's conclusion that the defendant was neither insane nor mentally ill. See *Stripling v. State*, 261 Ga. 1, 4 (3 a) (401 SE2d 500) (1991). The evidence supports the conviction. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The trial court did not abuse its discretion by denying the defendant's motion for sequestered voir dire at the competency trial and at the trial of the case-in-chief. See *Curry v. State*, 255 Ga. 215 (2 a) (336 SE2d 762) (1985); *Williamson v. Lucas*, 171 Ga. App. 695 (1) (320 SE2d 800) (1984).

3. There was no abuse of discretion in the trial court's control of the competency-trial voir dire examination. *Curry v. State*, supra at 218; *Waters v. State*, 248 Ga. 355, 363 (3) (283 SE2d 238) (1981).

4. The defendant was not denied an evidentiary hearing on his motion for change of venue. He simply chose not to present evidence in addition to the voir dire examination of the prospective jurors. Compare *Villa v. State*, 190 Ga. App. 530 (2) (379 SE2d 417) (1989) (defendant's request for evidentiary hearing erroneously denied). The record supports the trial court's denial of the defendant's motion for change of venue. *Lee v. State*, 258 Ga. 82 (9) (365 SE2d 99) (1988).

5. Taylor contends the court erred by qualifying two prospective jurors who were, Taylor argues, impermissibly biased in favor of a death sentence. We note that the trial court well understood its duty in this regard. At a pre-trial hearing, the court explained:

[T]he two obligations of a juror . . . [are] to render a verdict in accordance with the evidence and the law. If the juror's disapproval of capital punishment is so strong that it would prevent him or her from being able to perform those two obligations as a juror, then I'm going to let that juror be excused for cause. But the other side of the coin is, if the juror's views are so strongly in favor of capital punishment that he can't perform those two functions, I'm going to excuse him for cause, too. It's a two-edged sword. Both sides are entitled to a jury whose minds are not closed on the question of what punishment should be [imposed] for murder. [The jury] should be able to listen to the evidence and the law and form a verdict based upon that and not some

---

still call the witness after the witness has already testified. Nor need we decide if the failure to appoint a *licensed* psychologist could be reversible error when the court has provided the defendant with funds to retain a mental health expert — including a psychiatrist or licensed psychologist — of his own choosing.

already fixed views on capital punishment.
[Transcript, Hearing of August 1, 1990 at p. 57.]

Compare *Skipper v. State*, 257 Ga. 802 (8) (364 SE2d 835) (1988).

The two prospective jurors at issue here gave conflicting answers to the death-qualification questions, but the court was authorized to conclude that the "final distillation" of their thoughts about the death penalty supported their qualification as jurors. See *Spivey v. State*, 253 Ga. 187, 197, fn. 3 (319 SE2d 420) (1984). There was no error. *Jefferson v. State*, 256 Ga. 821 (2) (353 SE2d 468) (1987).

6. The autopsist brought with him to trial 13 photographs he took of the victim's body. Defense counsel did not see any of them until trial. Neither did the prosecutor, apparently. Defense counsel objected to the lack of an opportunity to review the photographs before trial. The objection was overruled. Ultimately, three of these photographs were admitted in evidence. The rest were excluded, on grounds of unnecessary gruesomeness or duplication. In addition, three crime-scene photographs of the victim were admitted, and two excluded. Of the six photographs admitted at trial, the defendant complains on appeal about four of them.

(a) The defendant contends that the autopsist's photographs should have been furnished him prior to trial as "scientific reports" discoverable pursuant to OCGA § 17-7-211. This contention was not raised at trial. Moreover, these photographs were not "written scientific reports" discoverable under OCGA § 17-7-211. *Gosdin v. State*, 176 Ga. App. 381 (4) (336 SE2d 261) (1985).

(b) Alternatively, the defendant contends, as he did at trial, that these photographs should have been disclosed to him before trial pursuant to the trial court's pre-trial directive that the state provide defense counsel an opportunity to inspect and test physical evidence. However, even assuming the court's order could be read broadly enough to encompass the photographs at issue, "the enforcement of its directives is a matter committed primarily to the trial court's sound exercise of discretion." *Hightower v. State*, 259 Ga. 770, 771 (2) (386 SE2d 509) (1989).

When defense counsel pointed out that he had not viewed these photographs before trial, the court asked defense counsel:

What harm have you incurred? You're going to be able to cross-examine this witness with respect to these photographs. Let's assume all [you say] is true, what harm have you incurred in not having seen them until now?

Defense counsel could only answer:

I don't know what harm it's going to be, Judge, but I want to

get the objection on the record.

The trial court overruled the objection but offered defense counsel a recess if he wanted one before beginning his cross-examination.

There was no abuse of discretion. *Hightower v. State*, supra.

(c) The defendant contends one of the crime-scene photographs of the victim's body should have been excluded because it showed two small discs attached to her body, apparently placed there by emergency medical technicians during the resuscitation attempt. He contends the photograph violates the rule established in *Brown v. State*, 250 Ga. 862 (5) (302 SE2d 347) (1983), forbidding in most cases the use of photographs depicting the victim "after autopsy incisions are made or after the state of the body is changed by authorities. . . ." Id. at 867.

The defendant did not object to the admission of this photograph at trial, on this or any other ground. It is clear, however, that this photograph was not subject to a *Brown* objection. It was a pre-autopsy photograph, and merely attaching two small discs (the defendant calls them "leads") to the victim's chest area did not meaningfully change the "state" of the body. There was no error.

(d) The defendant contends that two of the autopsist's photographs should have been excluded as duplicative. We note that the trial court reviewed the photographs with an eye toward avoiding duplications and that 12 of the state's 18 photographs of the body were not admitted in evidence. While recognizing that there was of necessity some "overlap," the court determined that the photographs finally selected for admission "don't appear duplicated to me." The record supports the trial court's judgment, and we find no abuse of discretion. *Hicks v. State*, 256 Ga. 715 (13) (352 SE2d 762) (1987).

7. When the magistrate testified that she had issued a "good behavior warrant" at the victim's request, the state asked her to explain the "purpose" of such a warrant. The defendant objected that she was not "qualified to say what the purpose of the warrant is. . . ." The court ruled:

Well, she's the chief magistrate, and she is authorized under the law to issue good behavior warrants, and I'm going to let her testify as to the function under the law that such a warrant performs.

Although the magistrate was not an attorney, the trial court was authorized to conclude that she was qualified by her position and experience to answer the question. See *Brown v. State*, 245 Ga., supra at (1).

8. After the defense questioned the magistrate about portions of

testimony she had given in a previous hearing, the state was entitled to bring out additional relevant portions of the magistrate's prior testimony, *Wynes v. State*, 182 Ga. 434 (3) (185 SE 711) (1936), notwithstanding the defendant's claim that he was not trying to impeach the witness but "simply trying to refresh [her] memory." *Metts v. State*, 162 Ga. App. 641 (3) (291 SE2d 405) (1982).

9. During his closing argument, the prosecutor attempted to explain why the identification of exhibits became "tedious" at times:

> That is a procedural thing that we are under. And while it distracts from the flow it is absolutely necessary, so that everyone will know, should they review this, or should someone else want to know at some other time what exhibit was what, we will know.

The defendant contends this argument was an impermissible comment on the possibility of appellate review, citing OCGA § 17-8-76 (a) and *Caldwell v. Mississippi*, 472 U. S. 320 (105 SC 2633, 86 LE2d 231) (1985).

> In *Caldwell v. Mississippi* [, supra], the United States Supreme Court held that a death sentence was invalid where a jury imposed it after a prosecutor argued to the jury that, if its sentencing determination was unfair, it could be corrected by an appellate court. Such an argument, the Court reasoned, was misleading as to the nature of appellate review, and might impermissibly tempt the jury to delegate its sentencing responsibility to the appellate court. [*Romine v. State*, 256 Ga. 521, 532 (350 SE2d 446) (1986).]

Long before *Caldwell v. Mississippi*, supra, was decided, this court condemned similar arguments. In *Prevatte v. State*, 233 Ga. 929 (214 SE2d 365) (1975), for example, we reversed the defendant's death sentences because the prosecutor had informed the jury that this court would review the sentence and set it aside if we did not think it warranted. Such arguments, we held, "encourage the jury to attach diminished consequence to [its] verdict, and to take less than full responsibility for [the] awesome task of determining life or death. . . ." Id. at 931.

However, the mere mention of a possibility that the record might be reviewed does not necessarily diminish the jury's sense of responsibility for its verdict, and we do not find the argument here to have had that effect. See, e.g., *Moon v. State*, 258 Ga. 748 (15) (375 SE2d 442) (1988); *Ingram v. State*, 253 Ga. 622, 637 (17) (323 SE2d 801) (1984). Nor do we find a violation of OCGA § 17-8-76. *Romine v. State*, supra at 532-533 (10).

10. The defendant's request to charge number 7 was adapted from our suggested charge on the § b (7) aggravating circumstance set out in an Appendix to *West v. State*, 252 Ga. 156 (313 SE2d 67) (1984). The defendant's requested charge, however, contained additional language, such as: "You are cautioned that all murders are horrible." The trial court declined to give the requested instruction, but gave instead a charge on the § b (7) circumstance that was more nearly verbatim to the suggested charge in *West*. There was no error. *Parker v. State*, 256 Ga. 543 (11) (350 SE2d 570) (1986).

11. The court declined to give the defendant's requested charge on residual doubt, but observed that the defense could argue residual doubt as a mitigating circumstance. There was no error. *Moon v. State*, 258 Ga., supra at 759-760 (33). It is well settled that a trial court is not required in its charge to "identify mitigating circumstances offered by the defendant." *Davis v. State*, 255 Ga. 598, 612 (22) (340 SE2d 869) (1986).

12. The trial court did not err by failing to deliver the defendant's requested charges 14 and 15. The former essentially was covered by the charge the court did give, see *Pruitt v. State*, 258 Ga. 583, 588 (13) (373 SE2d 192) (1988), and the latter was unnecessary absent any request by the jury for instruction on the subject of parole. *Quick v. State*, 256 Ga. 780, 787 (9) (353 SE2d 497) (1987).

13. The jury found as a statutory aggravating circumstance that the offense of murder was "outrageously vile, horrible, inhuman in that it involved torture and aggravated battery to the victim." See OCGA § 17-10-30 (b) (7). The defendant contends that the evidence does not support this finding, that the § b (7) aggravating circumstance is unconstitutionally vague and overbroad, that the disjunctive language of the statute allows non-unanimous verdicts, and that in any event his death sentence is excessive and disproportionate to sentences imposed in similar cases.

(a) The defendant contends the wording of the § b (7) aggravating circumstance does not sufficiently channel and limit the sentencer's discretion to impose the death sentence. See, e.g., *Maynard v. Cartwright*, 486 U. S. 356 (108 SC 1853, 1858, 100 LE2d 372) (1988). As we have recognized:

"a [death-penalty] system 'could have standards so vague that they would fail adequately to channel the sentencing decision pattern of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* [*v. Georgia*, 408 U. S. 238 (92 SC 2726, 33 LE2d 346) (1972)] could occur.' [Cit.] To avoid this constitutional flaw, an aggravating circumstance must *genuinely narrow* the class of persons eligible for the death penalty and

must *reasonably justify* the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens,* [462] U. S. [862] (103 SC 2733, 77 LE2d 235) (1983). [*Davis v. State,* 255 Ga. 588, 594 (340 SE2d 862) (1986).]

Hence, we have not only provided a limiting construction of the § b (7) circumstance, see *Hance v. State,* 245 Ga. 856 (3) (268 SE2d 339) (1980), we have provided a suggested jury instruction incorporating the limiting construction delineated in *Hance.* See *West v. State,* 252 Ga. 156, 161-162 (313 SE2d 67) (1984). The instruction suggested in *West* was delivered by the trial court to the jury in this case.

We are satisfied that our construction of the § b (7) circumstance sufficiently channels and limits the sentencer's discretion, and that the § b (7) circumstance is not unconstitutionally vague or overbroad as applied. Compare *Shell v. Mississippi,* 498 U. S. ____ (111 SC 313, 112 LE2d 1) (1990).

(b) There was no possible lack of unanimity in the jury's § b (7) finding, because it was stated in the conjunctive, not the disjunctive. *Holiday v. State,* 258 Ga. 393 (19 b) (369 SE2d 241) (1988).

(c) The defendant contends the evidence does not support the jury's § b (7) finding. He contends there was no aggravated battery other than that which killed the victim, and no intentional torture. He compares this case to such cases as *Phillips v. State,* 250 Ga. 336 (6 a) (297 SE2d 217) (1982) and *Whittington v. State,* 252 Ga. 168 (313 SE2d 73) (1984), in which we found the evidence insufficient to support a finding of the § b (7) circumstance.

Phillips went to the school where his wife worked, fired his gun four or five times in rapid succession, and left. We compared the facts of Phillips' case to cases in which the defendant had inflicted multiple wounds in a deliberate attempt to inflict serious physical abuse before death. We concluded that no such deliberate attempt had occurred in the Phillips case and that "where the defendant kills his victim by four or five shots in rapid succession, no other facts appearing, he has not tortured the victim. . . ." *Phillips,* supra at 342.

Theresa Whittington murdered the wife of the man with whom she was in love, at his behest. He gave Whittington a gun and sent her into the victim's house to kill her. Whittington fired one shot and ran out of the house. The victim was still alive, and the husband ordered Whittington back inside to "get it over with." Whittington re-entered the house and shot the victim once more, this time killing her. We held that the evidence failed to support a finding of intentional torture.

In this case, after being warned to stay away from his wife, the defendant entered her apartment, locked the doors, and viciously at-

tacked his wife with a knife, cutting her five times in her face, once on her hand, another six times in her chest and back (one of these wounds was deep enough to penetrate her left lung and was potentially fatal), and slashing her throat at least seven times so deeply as to nearly decapitate her.

This case is not similar to *Phillips* or *Whittington*. The evidence here supports a finding that the defendant "inflicted deliberate, offensive and prolonged pain on his victim prior to death," *Phillips*, supra at 341, and that the defendant deliberately and needlessly mutilated the victim. The jury was authorized to conclude from the evidence that the offense of murder involved the commission of torture and aggravated battery.[3] *Hall v. State*, 259 Ga. 412 (383 SE2d 128) (1989); *Hicks v. State*, 256 Ga. 715 (352 SE2d 762) (1987). The evidence, viewed in the light most favorable to the state, supports the jury's § b (7) finding beyond a reasonable doubt. OCGA § 17-10-35 (c) (2).

(d) We do not find that Taylor's death sentence is either excessive or disproportionate to sentences imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the death sentence in this case.

14. It is not error to tell the jury that a death sentence will not be imposed unless the jury "recommends the death sentence in its verdict." The instructions given clearly informed the jury its recommendation would be binding. *Isaacs v. State*, 259 Ga. 717 (43 h) (386 SE2d 316) (1989).

15. During its instructions to the jury at the sentencing phase, the trial court stated that the § b (7) aggravating circumstance contended by the state was the "only statutory aggravating circumstance that the evidence *justifies* or authorizes you to consider." Although the defendant conceded at trial that the court's use of the word "justifies" instead of "authorizes" was a slip of the tongue, he now contends the charge was harmful error because it implied that if the jury found the § b (7) circumstance the death penalty automatically should be imposed. However, not only did the judge recognize his slip of the tongue immediately and attempt to correct it in the same sentence in which it occurred, but he then completely restated the sentence using the word "authorizes" and omitting the word "justifies." The "palpable" slip of the tongue could not have "misled or confused the jury." *Gober v. State*, 247 Ga. 652 (3) (278 SE2d 386) (1981). There was no reversible error.

16. We do not find that Taylor's sentence of death was imposed

---

[3] The offense of aggravated battery is committed when the defendant "maliciously causes bodily harm to another . . . by seriously disfiguring his body. . . ." OCGA § 16-5-24 (a).

as the result of impermissible passion or prejudice or any other arbitrary factor. OCGA § 17-10-35 (c) (1). The defendant's conviction and death sentence are affirmed.

*Judgment affirmed. All the Justices concur.*

### APPENDIX.

*Hall v. State,* 259 Ga. 412 (383 SE2d 128) (1989); *Jefferson v. State,* 256 Ga. 821 (353 SE2d 468) (1987); *Davis v. State,* 255 Ga. 598 (340 SE2d 869) (1986); *Roberts v. State,* 252 Ga. 227 (314 SE2d 83) (1984); *Berryhill v. State,* 249 Ga. 442 (291 SE2d 685) (1982); *Dick v. State,* 246 Ga. 697 (273 SE2d 124) (1980); *Amadeo v. State,* 243 Ga. 627 (255 SE2d 718) (1979); *Bowden v. State,* 239 Ga. 821 (238 SE2d 905) (1977); *Young v. State,* 237 Ga. 852 (230 SE2d 287) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State,* 236 Ga. 339 (223 SE2d 703) (1976); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975).

### DECIDED MAY 10, 1991 —
### RECONSIDERATION DENIED JUNE 7, 1991.

*Boatright & Futch, Jimmy J. Boatright, Kenneth E. Futch, Jr., Beauchamp & Associates, Kermit S. Dorough, Jr.,* for appellant.

*Harry D. Dixon, Jr., District Attorney, George E. Barnhill, Deborah M. Perlis, Assistant District Attorneys, Michael J. Bowers, Attorney General, C. A. Benjamin Woolf,* for appellee.