### S00A0908. HEAD v. TAYLOR.
(538 SE2d 416)

HINES, Justice.

Keith Brian Taylor killed his wife on January 12, 1989, by stabbing and slashing her with a knife. A jury convicted him of murder and recommended a death sentence, and this Court affirmed the conviction and sentence. *Taylor v. State*, 261 Ga. 287 (404 SE2d 255) (1991). The United States Supreme Court denied certiorari. *Taylor v. Georgia*, 505 U. S. 947 (112 SC 393, 116 LE2d 343) (1991). Taylor filed a petition for a writ of habeas corpus on December 20, 1995, and amended the petition on November 21, 1997. After an evidentiary hearing, the habeas court granted the writ and vacated Taylor's conviction and sentence due to ineffective assistance of counsel. The warden appeals this decision. We affirm.

### Claims That Are Barred

1. Claims that were previously raised and resolved on direct appeal are barred from review on habeas corpus because "[a]fter an appellate review the same issues will not be reviewed on habeas corpus." *Elrod v. Ault*, 231 Ga. 750 (204 SE2d 176) (1974); *Gaither v. Gibby*, 267 Ga. 96 (2) (475 SE2d 603) (1996) (issues raised and decided on direct appeal cannot be reasserted on habeas corpus). The habeas court correctly found that the following claims in Taylor's habeas petition were raised and decided on direct appeal: the trial court's alleged failure to appoint a qualified medical expert to evaluate Taylor's sanity before trial in accordance with OCGA § 17-7-130, *Taylor*, 261 Ga. at 289-290 (1); an alleged improper reference to appellate review by the State during guilt-innocence phase closing argument, id. at 294 (9); the alleged improper sentencing phase jury charge, id. at 295-297 (10), (11), (12), (14), and (15); an alleged error for failing to excuse for cause jurors Whitaker and Turner for bias in favor of the death penalty, id. at 291-292 (5); and the alleged failure by the trial court to hold a hearing on Taylor's motion for a change of venue, id. at 291 (4). Since these claims have already been addressed on direct appeal, they are barred from habeas corpus review. *Gaither*, supra.

## Claims That Are Defaulted

2. The failure to raise an issue on direct appeal that could have been raised at that time defaults that issue on habeas corpus, unless the habeas petitioner can meet the cause and prejudice test.

> [A] failure to make timely objection to *any* alleged error or deficiency or to pursue the same on appeal ordinarily will preclude review by writ of habeas corpus. However, an otherwise valid procedural bar will not preclude a habeas corpus court from considering alleged constitutional errors or deficiencies if there shall be a showing of adequate cause for failure to object or to pursue on appeal *and* a showing of actual prejudice to the accused.

*Black v. Hardin*, 255 Ga. 239 (4) (336 SE2d 754) (1985). See also OCGA § 9-14-48 (d). Taylor raises the following claims for the first time on habeas corpus: improper comments by the prosecutor during his opening statement; improper closing argument by the prosecutor (other than the alleged reference to appellate review) in the guilt-innocence phase of the trial; improper State argument in the penalty phase; possible juror misconduct; improper jury instructions in the guilt-innocence phase; improper conduct by the trial court during voir dire; the trial court's failure to excuse for cause jurors other than jurors Whitaker and Turner due to bias in favor of the death penalty; the trial court's failure to provide funds for a psychiatrist and a mitigation specialist; the violation of the Unified Appeal Procedure; the constitutionality of Georgia's death penalty statute; and that execution by electrocution is cruel and unusual. The habeas court correctly found that these alleged errors are procedurally defaulted because they could have been raised earlier and Taylor failed to demonstrate that an objective, external factor impeded defense counsel's ability to raise these errors on direct appeal or that his trial was infected with error of constitutional dimensions. See *Turpin v. Todd*, 268 Ga. 820, 825-828 (493 SE2d 900) (1997) (explaining cause and prejudice test for overcoming habeas corpus procedural default). The habeas court also considered several of these claims on their merits and found them to be unsupported by the trial record. The habeas court further found that Taylor's claim of cumulative error was without merit because Georgia does not recognize the cumulative error rule. *Laney v. State*, 271 Ga. 194 (11) (515 SE2d 610) (1999). We find no error with the habeas court's rulings on these claims.

## Ineffective Assistance of Counsel

3. Taylor's claim of ineffective assistance of counsel is neither barred nor defaulted because such claim need not be raised until trial counsel no longer represents the defendant. *White v. Kelso*, 261 Ga. 32 (401 SE2d 733) (1991). Taylor's trial counsel represented him through his direct appeal and new counsel began representing him on habeas corpus after trial counsel ceased their representation. Since ineffective assistance of trial counsel was raised at the first available opportunity after new counsel came onto the case, it remains a viable claim on habeas corpus. See id.

In order to prevail on a claim of ineffective assistance of counsel, Taylor must show both deficient performance by trial counsel and actual prejudice. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985). To show deficient performance, he must demonstrate that trial counsel's performance was not reasonable under the circumstances confronting them before and during the trial, without resorting to hindsight. *Strickland*, supra at 689-690; *Smith*, supra. Taylor's burden is high because trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, supra at 690. To show actual prejudice, Taylor must demonstrate that "there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith*, supra. A claim of ineffective assistance is a mixed question of law and fact. *Strickland*, supra at 698; *Lajara v. State*, 263 Ga. 438 (3) (435 SE2d 600) (1993). On appeal, we accept the habeas court's factual findings unless clearly erroneous, but we independently apply the relevant legal principles to the facts. *Linares v. State*, 266 Ga. 812 (2) (471 SE2d 208) (1996).

The circumstances of the homicide clearly show that Taylor killed his wife, Lori Taylor. See *Taylor*, 261 Ga. at 287-288. After Lori took out a "good behavior" warrant to have him removed from their apartment, Taylor and his wife were alone in the apartment. From outside, Lori's cousin heard her say, "Keith, don't do it." A police officer knocked on the apartment door a few minutes later and Taylor answered "dripping" with blood. Taylor said, "take me to jail" and he was placed in a patrol car. Lori was found lying on the floor dying from multiple stab and slash wounds. A bloody knife, identified by Taylor's son as belonging to Taylor, was found hidden inside a closet.

Taylor has a long history of mental illness that trial counsel attempted to use in his defense in both phases of his trial. The State countered with evidence that Taylor may have been malingering by

exaggerating his mental problems. In the final order vacating Taylor's conviction and sentence, the habeas court identified several areas where trial counsel was ineffective. Before these areas can be discussed, it is necessary for us to recite Taylor's background, the circumstances leading up to trial, and the evidence presented at trial.

## Taylor's Background

Trial counsel subpoenaed records from the many hospitals that had treated Taylor and they spoke with Taylor and his mother. In addition to the diagnoses and treatments, the records contained a family and work history. Based on these sources, trial counsel knew the following: Taylor was born in 1954 and raised in Miami as one of ten children. He has one brother who is schizophrenic and a sister who is mentally retarded. His school history shows some difficulties and expulsions, but he managed to obtain a high school diploma and attend some college classes. He was married three times, but none of the marriages lasted. In 1975, he enlisted in the Army and was trained as a computer operator. In 1977, he married Lori Taylor and they had two children. He reached the rank of staff sergeant, but in 1980 his military career began to deteriorate. The records reveal a nervous breakdown in 1980 that resulted in extended treatment in a mental hospital. The diagnosis from this hospitalization was adjustment disorder. The records also note paranoia and substance abuse. Also, he was twice treated at mental hospitals while stationed in Germany in 1983 and 1984. Much of his paranoia centered around his wife, who he said he did not trust; he was also upset about her conversion to the Jehovah's Witness faith. He was discharged from the Army in 1984.

After his discharge, Taylor continued to have significant mental health problems and he was repeatedly treated for these problems. Diagnoses included chronic paranoia, mixed personality disorder, depression, substance abuse, suicidal ideation, and schizophrenia. He was frequently treated with anti-psychotic medications such as Haldol and Mellaril. There are also indications in some of the reports that he may be a malingerer. The extent of his paranoia is documented in a report by a psychologist, Dr. Eaton, who evaluated Taylor in April 1987. Dr. Eaton wrote that Taylor spent much of his time "thinking about a conspiracy which he believes has been launched against him." He used to shoot pool, but no longer did this "because he fears someone involved with a conspiracy will shoot him." He was not working, had marital problems, and "fears and mistrusts everyone and consequently has no friends." He spent most of his time at home, inside his house. Lori Taylor told Dr. Eaton that Taylor was extremely jealous and had been for some time. She reported that he

accused her of being in strange cars when she had been at work. She also confirmed that Taylor believed that a number of people were conspiring against him. Dr. Eaton further indicated that Taylor was paranoid in his belief that his wife had been unfaithful to him, and that he believed that his in-laws, the city of Blackshear (for whom he had worked for three months), and his wife's church were plotting to kill him. Dr. Eaton diagnosed Taylor with chronic paranoid schizophrenia. He also noted that Taylor appeared to be "manipulative, self-serving, and capricious."

Taylor was periodically treated on an out-patient basis at the Satilla Mental Health Clinic from 1987 to 1989 and diagnoses included paranoid schizophrenia; his conspiracy theories involving his wife and in-laws were also noted. He was treated with Haldol and Mellaril. In August 1988, Taylor was hospitalized at the Georgia Regional Hospital in Savannah due to suicidal thoughts and threats to neighbors. He was diagnosed with a mixed personality disorder and also suspected of malingering. His paranoia regarding his wife, that he suspected her of seeing other men, was noted. He was discharged with a prescription for Haldol. At this time Taylor was separated from his wife, who had removed his name from the lease on their Blackshear apartment and had the locks changed. In October 1988, Taylor was admitted to the VA hospital in Miami for ten days due to depression and a fear he may hurt himself. A psychiatrist noted his long history of mental problems dating back to the early 1980s, but also stated in a report that Taylor appeared to exaggerate his symptoms to gain attention. He was diagnosed with substance abuse and dependent personality disorder.

Lori's landlord testified at trial that Taylor moved back in with Lori several days before her death. On January 12, 1989, Lori went to the courthouse with Taylor and their two children. According to witnesses, Taylor did not seem violent; in fact, his only apparent criminal history at the time was a bad check charge in 1988. Lori sought a "good behavior" warrant to have Taylor removed from the apartment. She told the magistrate that she was afraid of Taylor because of his mental condition and the warrant was issued. When they left the courthouse, Lori drove back to the apartment and Taylor walked back with the children. Taylor left the children outside when he entered the apartment and the homicide occurred a few minutes later. After Taylor was arrested and placed in the patrol car, he told the police officer that "the James's (Lori's family) are going to kill me."

## The Circumstances Before Trial

Attorneys Kenneth Futch and Jimmy Boatright were appointed to represent Taylor. They testified at the habeas evidentiary hearing that Taylor was sometimes lucid and helpful and sometimes uncooperative. Taylor told them he thought his wife had been cheating on him and that others were part of a conspiracy against him. Taylor frequently only wanted to discuss the various conspiracies against him and he would not provide an account of the events during the killing. Trial counsel decided, based on the circumstances of the crime and Taylor's history, that a mental health defense in both phases of the trial would be their best strategy. Taylor was able to provide the names of many of the hospitals and doctors that had earlier treated him and trial counsel subpoenaed records from them.

A letter Taylor wrote to Futch in March 1989 is indicative of his mental state in jail shortly after the killing. He wrote that it had been three weeks since he had been to the Satilla Mental Health Clinic and he believed that he was in need of more mental health treatment. He said that his medication had run out and the jailers were reluctant to take him for more treatment. He claimed to be suffering from uncontrollable crying and shaking, bad dreams, and headaches. He believed that Lori's father was making payoffs to the jail personnel to "get to me" and that "they want me to commit suicide." He asked Futch for help in getting more treatment.

The trial court ordered a competency evaluation and Taylor was evaluated by Dr. D'Alessandro in July 1989. Dr. D'Alessandro administered several tests to Taylor and found him to be competent and "free from any major psychiatric disorder of either mood or thought." Dr. D'Alessandro found that drug and alcohol abuse were Taylor's major problems and noted that possible malingering was reported in some of Taylor's previous evaluations.

Trial counsel testified before the habeas corpus court that Taylor's paranoia and conspiracy beliefs increased as the trial approached. He became less and less cooperative. In 1990, trial counsel hired an investigator to help with Taylor's case. The investigator testified that he met with Taylor several times before trial and each time Taylor acted bizarre. Taylor kept telling the investigator that the furniture in his apartment had been moved "to confuse him." When the investigator tried to tell Taylor that this information had no bearing on the case, Taylor simply repeated this belief and would talk about nothing else.

Trial counsel hired a psychologist to independently evaluate Taylor. After reviewing Taylor's past medical records, the psychologist, Dr. Fisher, tried to evaluate Taylor on July 16, 1990. Taylor refused to say anything for at least the first 15 minutes of their meet-

ing and he repeatedly cried during the interview. He described a conspiracy against him by the city of Blackshear and his father-in-law to split up Taylor and his wife and then to have him killed. He stated that his attorneys were now a part of the conspiracy as well as Dr. Fisher. He refused to take any psychological tests. Dr. Fisher wrote trial counsel and summarized Taylor's mental health history. He indicated that he was unable to administer testing to Taylor because Taylor believed that his attorneys and Dr. Fisher were part of a conspiracy against him. Dr. Fisher opined that Taylor was not malingering. He concurred with past evaluators who found Taylor's paranoia to be a chronic condition, and he further stated that Taylor's paranoid thought disorder was progressively deteriorating. He warned that Taylor's paranoia was making him unable to work cooperatively with his lawyers or his psychologist. He also wrote, "It is my understanding that he is not on medication, and consequently it is the opinion of this evaluator that this condition will continue, with rejection of nearly everyone around him as being involved in a conspiracy, until treatment is forthcoming." Boatright testified at the habeas corpus hearing that by this time Taylor's paranoia had reached a level where he often refused to communicate with trial counsel during court proceedings. Handwritten notes made by Futch on July 17, 1990, show that trial counsel considered making a motion to have medication administered to Taylor, but no such motion was made.

Dr. Fisher tried to evaluate Taylor again on August 30, 1990, with similar results. He wrote trial counsel that Taylor "is a paranoid schizophrenic whose condition is getting worse." Taylor still refused to participate in any testing because of his belief in a conspiracy involving Dr. Fisher and his lawyers, who he saw as part of the "evil spirits" working to do him in. Dr. Fisher warned trial counsel that there were two problems associated with Taylor's deteriorating condition. One was that the jailers were bound to testify that Taylor, without being on medication, interacts with other inmates by playing basketball and chess and a jury would likely believe that this indicates a lack of mental illness. The second problem was that Taylor had submitted to testing conducted by the State's psychologist, Dr. D'Alessandro, the previous year when he would not now cooperate with his own expert. In other words, the State expert will be able to opine about a lack of mental illness revealed by testing, and Dr. Fisher will be forced to concede that he conducted no testing on the defendant. Dr. Fisher stated that these problems would make convincing the jury that Taylor is a paranoid schizophrenic very difficult. Dr. Fisher continued, "My hope is that as his trial nears, he will somehow become more compliant to testing on my part in order that we can get some material to contradict what the State's psychologists may well have." Dr. Fisher ventured that Taylor's condition could fur-

ther deteriorate before trial or he might improve "if he is able to recognize the seriousness and complexity of his situation." The case proceeded to trial.

## The Competency and Criminal Trials

A competency trial was scheduled before Taylor's criminal trial to determine whether Taylor was mentally fit to stand trial. The competency trial began on September 24, 1990. It was immediately apparent that the real question before the jury was whether Taylor was genuinely mentally ill or malingering. Dr. Fisher testified that Taylor was a paranoid schizophrenic and related his conspiracy beliefs and his ten-year history of mental problems. He opined that Taylor was not malingering. On cross-examination, he explained that it was possible for a schizophrenic to play basketball with other inmates and he conceded some old reports indicated substance abuse and possible malingering. The defendant was to be the next witness and he refused to take the stand. The State then presented its case. Two jailers testified that Taylor's behavior in jail was not unusual and that he interacted well with other inmates, including playing chess and basketball with them. One jailer conceded that he took Taylor to a mental health facility one time. Dr. D'Alessandro then testified that he had tested Taylor in July 1989 and in his opinion Taylor was competent to be tried and not a paranoid schizophrenic. He said that he had not heard of Taylor having any mental health problems while in jail, and that basketball and chess were not activities typically engaged in by paranoid schizophrenics. On cross-examination, he conceded that Taylor had been prescribed Haldol in 1988 and that Haldol was a major anti-psychotic drug. However, he averred that when he evaluated Taylor in July 1989 he was not aware of Taylor being on any psychotropic medication at that time. During closing argument, the State argued that Taylor was a malingerer and that Dr. Fisher's failure to test Taylor meant he could not accurately diagnose him. The State conceded that Taylor had been on Haldol in the past, but argued that there was no indication that Taylor was on Haldol now. If Taylor was truly a paranoid schizophrenic, the prosecutor argued, then trial counsel would have made arrangements to have Taylor properly medicated. The jury found Taylor competent to stand trial.

The criminal trial followed the competency trial. Whether Taylor was mentally ill or malingering remained the key point of contention. After the State rested in the guilt-innocence phase, the defendant testified. Taylor cried frequently and testified about the various hospitals and clinics that had treated him for "problems." He did not know what happened in the apartment when his wife was killed; he

said he was looking for "somebody" in his house and he answered the door when the police officer knocked. He knew something was wrong because there was blood on his hands. He testified that his sofa had been moved as part of a conspiracy and that lots of people in Blackshear were involved in the conspiracy. On cross-examination, he admitted to playing chess and basketball in jail, but said he "feels like it is a trap" when he speaks to people. He said he often forgets things, that prospective employers would not hire him because they prejudged him, that the Army conspired against him, and that he was "tricked" into moving to Blackshear.

Dr. Eaton next testified that he diagnosed Taylor with chronic paranoid schizophrenia in 1987, and that he had noted Taylor's conspiracy beliefs. He also testified that Taylor was manipulative and self-serving. Lonzie Webster, a counselor at the Satilla Mental Health Clinic, counseled Taylor on several occasions in 1987 and he testified that he believed Taylor was a paranoid schizophrenic with a mixed personality disorder. He reported that Taylor had been depressed and that his intellectual functioning had seemed low. The chaplain at the Satilla Mental Health Clinic testified that Taylor complained of visions and hearing voices in 1988, and that Taylor believed that his in-laws were trying to kill him. The chaplain also believed that Taylor was a paranoid schizophrenic, but noted that he was stable in September 1988 when he was on Haldol. Dr. Fisher then testified about his two evaluations of Taylor in 1990 and opined that Taylor was a paranoid schizophrenic who was too paranoid to submit to testing. He discussed Taylor's long history of mental illness and that, while not currently on medication, Taylor had been frequently prescribed anti-psychotic drugs like Haldol in the past. On cross-examination, he claimed that Taylor was not malingering, but admitted that Taylor had refused to take any psychological tests. He also stated that Taylor's ability to play basketball in jail was irrelevant to his diagnosis of paranoid schizophrenia. Dr. Sharma, a psychiatrist who had worked at the Satilla Mental Health Clinic, saw Taylor periodically from 1987 to 1989. She testified that Taylor displayed symptoms such as crying, headaches, depression, and substance abuse. She testified that Taylor was paranoid and she had often prescribed Mellaril, an anti-psychotic drug. She last saw him in February 1989, shortly after his arrest, and diagnosed him with having a paranoid, schizoid personality, being substance abusive, and having borderline intellectual functioning. She prescribed Haldol. She did not diagnose paranoid schizophrenia, but considered it. On cross-examination, she admitted that she had earlier noted that Taylor "wants to use mental illness to keep from facing responsibility when he gets into trouble."

On rebuttal, the State presented Dr. Martin, the jail doctor, who

testified that he observed no behavior by Taylor that was out of the ordinary. He could not recall whether he or any other doctor had prescribed psychotropic drugs to Taylor. He said he saw the defendant ten to twelve times for only such things as sinus and teeth problems; he also denied that anyone at the jail had ever asked him to examine Taylor for a psychological problem. Dr. D'Alessandro then testified about his July 1989 evaluation of Taylor, and said that he uncovered no major psychiatric disorders, delusions, or hallucinations. He stated that if Taylor was actually an unmedicated paranoid schizophrenic, he would find it hard to engage in activities with other people, like basketball. Trial counsel in closing argument asserted that Taylor was a paranoid schizophrenic with a long history of mental illness. The prosecutor in closing argued that Taylor was a malingerer who was not currently on medication for schizophrenia so the jury could conclude that he behaves normally when not abusing alcohol and illegal drugs. He said Taylor was trying to trick the jury and that the only appropriate verdict was guilty since Taylor was not insane or mentally ill. The jury convicted Taylor of malice murder.

In the sentencing phase, the State presented no additional evidence and the defense presented two witnesses. Dr. Fisher testified that Taylor would function well in prison if properly medicated[1] and he would not be dangerous. Taylor's mother testified about Taylor's background and said he was not violent; she asked for mercy. The defense argued in closing that Taylor had no violence in his background and that a death sentence would not benefit anyone. The jury recommended the death penalty.

### Deficient Performance

The habeas court found several areas where trial counsel's performance was deficient, but we will focus on only two deficiencies: (1) trial counsel's failure to ensure that Taylor was properly medicated before his trials so that he could assist in his defense and (2) trial counsel's failure to obtain the Pierce County Jail records which would have contradicted the testimony of the jail doctor and the jailers. We find that the habeas court's factual determinations regarding these deficiencies were not clearly erroneous. See *Strickland*, 466 U. S. at 698; *Linares*, 266 Ga. at 813 (2).

(1) *Failure to ensure that Taylor was properly medicated.* The habeas court found trial counsel deficient for failure to ensure that Taylor was properly medicated before trial so that he could assist in his defense. Trial counsel was aware of Taylor's long history of

---

[1] There is no evidence in either the habeas or trial records that Taylor was on medication when the homicide occurred.

mental illness and that he had been repeatedly treated with anti-psychotic drugs. Trial counsel also knew that Taylor's paranoia was increasing and that he began to consider trial counsel as part of the conspiracy arrayed against him. He was increasingly uncooperative and trial counsel knew that he was no longer being medicated for his mental illness. Taylor had written Futch as early as March 1989 that he needed more mental health treatment and that his medication had expired, but trial counsel took no action. The investigator hired in 1990 also reported that Taylor's behavior was bizarre and uncooperative. Most important, however, were the repeated warnings by Dr. Fisher that Taylor's paranoid schizophrenia was not being treated, his mental condition was deteriorating, and the lack of medication made him refuse to take psychological tests or otherwise cooperate with the doctor.[2] Moreover, Dr. Fisher warned trial counsel of the ramifications at trial of Taylor's refusal to cooperate with the psychologist. As predicted by Dr. Fisher, the State argued that Taylor's refusal to take tests for Dr. Fisher made Dr. Fisher's diagnosis less reliable than the diagnosis of its expert. Also as predicted by Dr. Fisher, the prosecutor argued that Taylor's apparent ability to interact with other inmates while unmedicated meant that he was a malingerer and not a schizophrenic. The State further argued at trial that Taylor could not be genuinely sick or Dr. Fisher or trial counsel would have ensured that he receive medicine while in jail.

The test for determining whether trial counsel's performance was deficient is whether a reasonable lawyer could have acted, under the same circumstances, as defense counsel acted before and during the trial. *Turpin v. Lipham*, 270 Ga. 208, 217 (510 SE2d 32) (1998); *Henry v. State*, 269 Ga. 851 (5) (b) (507 SE2d 419) (1998). Hindsight is not employed, and our purpose in making this determination "is not to grade trial counsel's performance, but simply to ensure that the adversarial process at trial worked adequately." *Lipham*, supra. "We are therefore highly deferential to the choices made by trial counsel during a trial that are 'arguably dictated by a reasonable trial strategy.'" Id. at 218, quoting *Devier v. Zant*, 3 F3d 1445, 1450 (11th Cir. 1993).

During the habeas corpus hearing, however, trial counsel conceded that they had no strategic reason for failing to ensure that Taylor was medicated so that he could cooperate with them and Dr. Fisher. Despite their knowledge of Taylor's conspiracy beliefs and Dr. Fisher's repeated warnings about his inability to properly evaluate Taylor unless his condition improved, trial counsel did not seek to

---

[2] Dr. Fisher testified at both trials that he could not prescribe medication for Taylor because he did not have a medical degree.

have him examined by a medical doctor and they did not pursue treatment for Taylor. They failed to respond despite knowing that he was not on the anti-psychotic medication with which he had been treated in the past, that his paranoid condition was deteriorating, and that, as warned by Dr. Fisher, Taylor's inability to cooperate would hurt them at trial. We conclude that the habeas court did not err by finding that trial counsel's performance was deficient due to the failure to adequately prepare their client for trial. In effect, trial counsel chose a strategy centered around their ability to convince the jury that their client was a paranoid schizophrenic and not a malingerer, but they proceeded to trial without taking the necessary action to prevent this strategy from being seriously impaired by Taylor's non-cooperation. No reasonable lawyer would have knowingly proceeded in this manner. See *Turpin v. Bennett*, 270 Ga. 584, 590 (513 SE2d 478) (1999). Trial counsel's failure to seek medication and treatment for their client before trial was deficient performance. See *Strickland*, 466 U. S. at 689-691.

(2) *Failure to obtain the Pierce County Jail records*. The habeas court found that trial counsel was deficient in failing to obtain Taylor's records from the Pierce County Jail which would have refuted the testimony of State witnesses and would have supported the credibility of Taylor's mental illness. With regard to the key point of contention at the trials, whether Taylor was mentally ill or a malingerer, Taylor's behavior in jail after the homicide and leading up to the trials was important evidence. Dr. Fisher had warned trial counsel of this and that jailers were bound to testify that Taylor had seemed normal in jail. Trial counsel was also aware that Taylor was having mental problems in jail from Taylor's letter to Futch in March 1989. But they made no effort to obtain the jail records.

As predicted by Dr. Fisher, two jailers testified at the competency trial that Taylor exhibited no unusual behavior in jail and that he interacted well with other inmates by playing basketball and chess. One of the jailers admitted that he took Taylor for mental health treatment once, presumably the visit to see Dr. Sharma at the Satilla Mental Health Clinic in February 1989, but this information was not followed up with by trial counsel. Dr. D'Alessandro then testified that he was unaware of any mental health problems experienced by Taylor while in jail. Similar testimony was presented by the State in the criminal trial. Dr. Martin, the jail doctor, testified that he observed no behavior by Taylor out of the ordinary and that he saw Taylor about a dozen times for only such ailments as teeth and sinus problems. He stated that he had never been asked by anyone to evaluate Taylor for a psychological problem. He could not remember if he or any other doctor had prescribed psychotropic drugs for Taylor while in jail. The picture presented by State wit-

nesses was that Taylor was an average inmate who did not display any symptoms of mental illness.

The Pierce County Jail records later obtained by habeas counsel show a different picture. Contrary to the testimony of the jailers and Dr. Martin, the records show repeated complaints by Taylor of headaches, stomachaches, uncontrollable crying and shaking, suicidal ideation, difficulty sleeping, bad dreams, "abnormal feelings," and "emotional stress disorder." The records show that Dr. Martin noted that Taylor was depressed and that he prescribed anti-depressant drugs for him. Although he could not recall at Taylor's criminal trial whether he had prescribed psychotropic drugs, the jail records show that in 1989 Dr. Martin personally increased Taylor's dosage of Mellaril, a psychotropic drug, and that Taylor was treated with Haldol shortly after his arrest.[3] In jail, Taylor repeatedly requested mental health treatment and Dr. Martin personally made several notations about contacting a mental health facility regarding Taylor, but Dr. Martin made no mention of these requests at Taylor's criminal trial and denied ever being asked to evaluate Taylor for a psychological problem. Dr. Martin testified on habeas corpus that the sheriff decided whether an inmate was transported for mental health treatment but, at the competency trial, the sheriff did not mention Taylor's numerous requests for mental health treatment. In fact, the sheriff testified that Taylor made no unusual complaints. The jail records further show that Taylor cut his wrist in an apparent suicide attempt in April 1989, and that Dr. Martin treated the wound and advised the jailer "to keep [a] close check on [patient]." On one request for medical care form, Taylor wrote to Dr. Martin, "I know I'm going to suffer. I'm experiencing fears that trouble me often. . . . I only know I must stay in pain."

The habeas court found factually that trial counsel "were on notice from their expert that the Petitioner's behavior while incarcerated was likely to be an issue" and that the "jail records could have been obtained with reasonable diligence." The habeas court also found that Taylor's letter to Futch in March 1989 should have put trial counsel on notice that he was having mental problems in jail. With regard to investigating a case, an attorney is not ineffective for failing to follow every evidentiary lead; instead, the "adequacy of the scope of an attorney's investigation is to be judged by the standard of reasonableness." *Jefferson v. Zant*, 263 Ga. 316, 319 (431 SE2d 110) (1993), quoting *Bush v. Singletary*, 988 F2d 1082, 1091 (11th Cir. 1993). The failure to conduct a reasonable investigation may consti-

---

[3] The jury did learn about the Haldol prescription because Dr. Sharma testified that she prescribed Haldol for Taylor in February 1989. There is no record of Taylor receiving Haldol or Mellaril in jail after March 1989.

tute deficient performance. See *Curry v. Zant*, 258 Ga. 527, 530 (371 SE2d 647) (1988). We agree with the habeas court that the failure to obtain the Pierce County Jail records, under these circumstances, was not reasonable. Trial counsel were warned before the trials that the State would claim that Taylor's behavior in jail was normal, but they failed to obtain records that were readily available that would refute this claim. Moreover, they were on notice from Taylor's March 1989 letter to Futch and from their own observations of their client that he was exhibiting symptoms of mental illness while in jail. We conclude that the habeas court did not err by finding that trial counsel's failure to obtain the jail records constituted deficient performance. See *Curry*, supra; *Jefferson*, supra.

### Actual Prejudice

The habeas court found that there was a reasonable probability that the outcome of Taylor's criminal trial would have been different had trial counsel "performed competently and obtained a medical evaluation and medication for Petitioner." See *Strickland*, 466 U. S. at 694; *Smith*, 253 Ga. at 783 (1). The habeas court also found a reasonable probability that the outcome of Taylor's criminal trial would have been different if trial counsel had performed competently and obtained the Pierce County Jail records which would have supported Taylor's claim of mental illness and refuted the claims of State witnesses that Taylor behaved normally in jail. See id. We agree. The key point of contention at Taylor's trials was whether he was a paranoid schizophrenic or a malingerer. The two main arguments advanced by the State to convince the jury that Taylor was not mentally ill was that Dr. D'Alessandro had tested Taylor and found no mental illness while the defense had not tested Taylor,[4] and that Taylor had behaved normally in jail. Trial counsel were aware that the State would make these arguments and their failure to act allowed the State to present its supporting evidence with little or no challenge. Under these circumstances, we conclude that the habeas court did not err by finding actual prejudice. Therefore, we affirm the habeas court's finding of ineffective assistance of trial counsel and its vacation of Taylor's conviction and death sentence.

*Judgment affirmed. All the Justices concur.*

---

[4] It can be argued that Dr. Fisher, if able to adequately test Taylor, might not have ultimately diagnosed him as a paranoid schizophrenic or as suffering from another mental illness. However, in addition to Dr. Eaton, Dr. Sharma and the other mental health professionals who found that Taylor was suffering from paranoia and schizophrenia before the homicide, we note that after Taylor arrived at the Georgia Diagnostic and Classification Center under a death sentence he was diagnosed by the prison psychiatrist as a paranoid schizophrenic and treated with anti-psychotic medication.

DECIDED OCTOBER 30, 2000.

*Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Patricia B. Burton, Assistant Attorney General,* for appellant.

*Troutman Sanders, Robert P. Edwards, Jr.,* for appellee.